******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., dissenting. "I would think it a violation of my oath to adhere to what I consider a plainly unjustified intrusion [on] the democratic process in order that the [c]ourt might save face. With some reservation concerning decisions that have become so embedded in our system of government that return is no longer possible . . . I agree with [United States Supreme Court] Justice [William O.] Douglas: 'A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written. But he remembers above all else that it is the [c]onstitution [that] he swore to support and defend, not the gloss [that] his predecessors may have put on it.' . . . Or as the [United States Supreme] Court itself has said: '[W]hen convinced of former error, [the] [c]ourt has never felt constrained to follow precedent. In constitutional questions, where correction depends [on] amendment and not [on] legislative action [the] [c]ourt throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions.'" (Citation omitted.) *South Carolina* v. *Gathers*, 490 U.S. 805, 825, 109 S. Ct. 2207, 104 L. Ed. 2d 876 (1989) (Scalia, J., dissenting), overruled in part on other grounds by *Payne* v. *Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).

I think my colleagues and I are well advised to carefully consider the words of Justice Antonin Scalia, particularly Chief Justice Rogers and Justice Robinson, who choose to uphold this court's decision in *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015), not because they have decided that that decision is right, but because of the dictates of stare decisis and concerns over the legitimacy of this court. I cannot fathom how Chief Justice Rogers and Justice Robinson believe they respect the rule of law by supporting a decision that is completely devoid of any legal basis or believe it is more important to spare this court of the purported embarrassment than to correct demonstrable constitutional error. Of course, it is possible that Justice Robinson believes that *Santiago* is correct, although he has not told us so. As I shall explain subsequently in this opinion, this approach prevents Justice Robinson from conducting—or at the very least from demonstrating to the public and to this court that he has undertaken—a full, fair, and objective analysis of the benefit and costs of applying stare decisis to *Santiago*.

I need not further swell the Connecticut Reports with a lengthy exposition on why *Santiago* is wrong. It suffices to say that the majority in that case employed an improper legal standard and wrongfully usurped the legislature's power to define crime and fix punishment, and the six factors set forth in *State* v. *Geisler*, 222

Conn. 672, 685, 610 A.2d 1225 (1992), support the conclusion that capital punishment remains consistent with the social mores of this state and is not cruel and unusual punishment in light of the passage of No. 12-5 of the 2012 Public Acts (P.A. 12-5). See generally *State* v. *Santiago*, supra, 318 Conn. 341–88 (*Zarella, J.*, dissenting). Instead, the primary object of this dissent is to bring order to our inconsistent and irreconcilable stare decisis jurisprudence by articulating a defensible and objective stare decisis standard. Then, in applying that standard in the present case, I will show why affording stare decisis effect to *Santiago* creates more harm than it does good. Finally, I will explain why overruling *Santiago* will enhance, not diminish, the integrity and legitimacy of this court.

## I

## STARE DECISIS

The concurring justices in the present case contend that the dictates of stare decisis require that we stand by our decision in *Santiago*.[1] In her concurring opinion, Chief Justice Rogers, quoting from *Dickerson* v. *United States*, 530 U.S. 428, 443, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), states: "[T]he doctrine [of stare decisis] carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." (Internal quotation marks omitted.) Then, quoting Justice Thurgood Marshall's dissenting opinion in *Payne* v. *Tennessee*, supra, 501 U.S. 849 (Marshall, J., dissenting), she provides the following special justifications: "the advent of subsequent changes or development in the law that undermine[s] a decision's rationale . . . the need to bring [a decision] into agreement with experience and with facts newly ascertained . . . and a showing that a particular precedent has become a detriment to coherence and consistency in the law . . . ." (Internal quotation marks omitted.) The majority in *Payne*, however, noted that the "[c]ourt has never felt constrained to follow precedent" when the "governing decisions are unworkable or are *badly reasoned* . . . ." (Emphasis added; internal quotation marks omitted.) *Payne* v. *Tennessee*, supra, 827; see also *Seminole Tribe* v. *Florida*, 517 U.S. 44, 63, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) ("[The court has] always . . . treated stare decisis as a principle of policy . . . and not as an inexorable command . . . . [W]hen governing decisions are unworkable or are badly reasoned, [the] [c]ourt has never felt constrained to follow precedent. . . . [The court's] willingness to reconsider [its] earlier decisions has been particularly true in constitutional cases, because in such cases correction through legislative action is practically impossible." [Citations omitted; internal quotation marks omitted.]). In demanding some " 'special justification' " to overrule *Santiago*, Chief Justice Rogers overlooks contrary statements by both the United

States Supreme Court and this court. The United States Supreme Court has often stated that it is not bound to follow unworkable or *badly reasoned* precedents. See, e.g., *Vieth* v. *Jubelirer*, 541 U.S. 267, 306, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004); see also *Smith* v. *Allwright*, 321 U.S. 649, 665, 64 S. Ct. 757, 88 L. Ed. 987 (1944) ("when convinced of *former error*, [the] [c]ourt has never felt constrained to follow precedent" [emphasis added]). In addition, we have often stated that we are free to overrule decisions that are clearly wrong. See, e.g., *Conway* v. *Wilton*, 238 Conn. 653, 660, 680 A.2d 242 (1996) ("[one] well recognized exception to stare decisis under which a court will examine and overrule a prior decision . . . [is when that prior decision] is *clearly wrong*" [emphasis added; internal quotation marks omitted]); see also *State* v. *Salamon*, 287 Conn. 509, 514, 526–27, 542–44, 949 A.2d 1092 (2008) (ultimately rejecting more than thirty years of this court's jurisprudence on Connecticut's kidnapping laws because majority of court was convinced it was wrong).

There is little doubt that Chief Justice Rogers overlooks the clearly wrong exception in our and the United States Supreme Court's stare decisis jurisprudence because it would lead her to no other conclusion than that *Santiago* must be overruled. A cursory reading of Chief Justice Rogers' dissent in *Santiago* reveals beyond any doubt that she strongly feels that the majority's decision in *Santiago* is obviously wrong. In fact, her belief that *Santiago* was completely wrong was central to her dissent in that case and not merely an observation made in passing. She describes the majority's analysis in *Santiago* as "fundamentally flawed"; *State* v. *Santiago*, supra, 318 Conn. 231 (*Rogers, C. J.*, dissenting); and "a house of cards, falling under the slightest breath of scrutiny." Id., 233 (*Rogers, C. J.*, dissenting). She further stated that it was "riddled with non sequiturs . . . [a]lthough to enumerate all of them would greatly and unnecessarily increase the length of [her dissent]." Id., 242 (*Rogers, C. J.*, dissenting). In *Santiago*, Chief Justice Rogers could uncover "no legitimate legal basis for finding the death penalty unconstitutional under either the federal or the state constitution"; id., 276 (*Rogers, C. J.*, dissenting); leading her to conclude that the majority in *Santiago* "improperly decided that the death penalty must be struck down because it offends the majority's subjective sense of morality." Id., 277 (*Rogers, C. J.*, dissenting).[2] In her dissent to this court's denial of the state's motion for argument and reconsideration of *Santiago*, Chief Justice Rogers further demonstrated how flawed she thought the decision in *Santiago* is. She stated: "Indeed, if there was ever any doubt, it is now inescapably clear that the three main pillars of the majority's analysis have no foundation . . . ." *State* v. *Santiago*, 319 Conn. 912, 919, 124 A.3d 496 (2015) (*Rogers, C. J.*, dissenting). In addition, she wrote: "By denying the state's motion

for argument and reconsideration, the majority merely reconfirms my belief that it has not engaged in an objective assessment of the constitutionality of the death penalty under our state constitution. Instead, the majority's conclusion that the death penalty is unconstitutional constitutes a judicial invalidation, without constitutional basis, of the political will of the people." (Internal quotation marks omitted.) Id., 920 (*Rogers, C. J.*, dissenting). In light of Chief Justice Rogers' repeated expressions regarding the fallacy of the majority opinion in *Santiago*, it is no wonder she now overlooks the clearly wrong exception to our stare decisis jurisprudence. She could not reasonably rely on stare decisis if she acknowledged that exception.

Chief Justice Rogers' action highlights a deeper problem with our case law on stare decisis. Our jurisprudence on stare decisis is constructed on contradictory principles inconsistently applied.[3] The concurring opinions of Justices Palmer and Robinson in the present case suffer from similar shortcomings.[4] Both fail to recognize the presence of certain characteristics that generally result in our affording of less stare decisis effect to a previous decision. At the very least, Justices Palmer and Robinson should explain why these characteristics are not important for purposes of the present case. For example, *Santiago* announces a rule that applies in criminal cases. In such context, we have often stated that "[t]he arguments for adherence to precedent are least compelling . . . when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants . . . ." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 523. This is especially true in the present case because the rule in *Santiago* was announced after the defendant in the present case, Russell Peeler, engaged in criminal conduct and was tried, convicted, and sentenced to death. In addition, neither Justice Palmer nor Justice Robinson explains why *Santiago* should not receive less deference in light of the fact that it is a constitutional holding. See, e.g., *Seminole Tribe* v. *Florida*, supra, 517 U.S. 63 ("[the court's] willingness to reconsider [its] earlier decisions has been particularly true in constitutional cases, because in such cases correction through legislative action is practically impossible" [internal quotation marks omitted]); see also *State* v. *Lawrence*, 282 Conn. 141, 187, 920 A.2d 236 (2007) (*Katz, J.*, dissenting) ("[i]ndeed, it is well recognized that, in a case involv[ing] an interpretation of the [c]onstitution . . . claims of stare decisis are at their weakest . . . [when the court's] mistakes cannot be corrected by [the legislature]" [internal quotation marks omitted]).

The inconsistent application of stare decisis leaves this court open to criticism that it is employing that doctrine to reach ideologically driven or politically expedient results, a real threat to this court's integrity

and institutional legitimacy.[5] Due to the underdevelopment of our stare decisis case law, that doctrine can be easily manipulated to reach a desired result. Thus, I take this opportunity to articulate a principled framework for the application of stare decisis.[6] Then, I will demonstrate why, in the present case, stare decisis should not be applied to this court's decision in *Santiago*.

Before I delve into the stare decisis framework and application, it is important that I address two preliminary matters. First, stare decisis has both a vertical and horizontal component. See, e.g., W. Consovoy, "The Rehnquist Court and the End of Constitutional Stare Decisis: *Casey*, *Dickerson* and the Consequences of Pragmatic Adjudication," 2002 Utah L. Rev. 53, 55. Vertical stare decisis refers to the principle that the decisions of this court are binding on the lower courts of this state. Id.; see also Black's Law Dictionary (10th Ed. 2014) p. 1626 (defining vertical stare decisis as "[t]he doctrine that a court must strictly follow the decisions handed down by higher courts within the same jurisdiction"). On the other hand, horizontal stare decisis addresses when this court should adhere to its own earlier decisions. See W. Consovoy, supra, 55; see also Black's Law Dictionary, supra, p. 1626 (defining horizontal stare decisis as "[t]he doctrine that court, esp[ecially] an appellate court, must adhere to its own prior decisions, unless it finds compelling reasons to overrule itself"). The balance of this opinion concerns only horizontal stare decisis.

Second, in my view, stare decisis has two modes of operation. As a general matter, stare decisis, Latin for "to stand by things decided"; (internal quotation marks omitted) Black's Law Dictionary, supra, p. 1626; is a doctrine that directs a court to adhere to its earlier decisions or to the decisions of courts that are higher in a jurisdiction's judicial hierarchy. More specifically, however, the doctrine operates in two distinct manners. First, the doctrine functions automatically in most cases. I will call this mode of operation the rule of precedent. Under this aspect of stare decisis, the court assumes that its prior decisions are correct and relies on such decisions in deciding the case before the court. Under the rule of precedent, our previous decisions are the bricks of the foundation on which the pending case will be decided. Moreover, we rely on such decisions, in large part, simply because they were decided prior in time, that is, because they are precedent. Each time this court cites a previous case to support a proposition, the rule of precedent mode of operation of stare decisis is implicitly at work. Second, stare decisis operates more explicitly and directly when we reconsider a previous decision or line of decisions. In this context, the doctrine provides a framework for determining whether the court should continue to abide by a past decision, even though it may be wrong. It is this distinct mode

of operation—more particularly, the framework it provides—that I will address in this opinion. With these preliminary ideas in mind, I now turn to articulating a principled doctrine of stare decisis.

## A

### A Principled Doctrine of Stare Decisis

As I just explained, stare decisis guides this court's determination of whether it should adhere to a previous erroneous decision. Implicit in this framing of stare decisis is that the court must decide whether the decision being reconsidered is wrong before it applies the doctrine of stare decisis.[7] In fact, and as I explain later in this part of my opinion, the stare decisis analysis cannot be completely conducted unless the court has determined if, and more importantly, why, the previous decision is incorrect. Moreover, the court need not resort to the doctrine of stare decisis if it concludes that the previous decision is correct. See R. Fallon, "Stare Decisis and the Constitution: An Essay on Constitutional Methodology," 76 N.Y.U. L. Rev. 570, 570 (2001). In such circumstances, the court can simply affirm the case on the basis of its merits. Id.

I do not mean to suggest, however, that the wrongness of the previous decision is part of the stare decisis calculus. It is *not*. Indeed, it is fundamental that we avoid conflating the merits and stare decisis considerations. The reasons should be obvious. If a case could be overruled simply because a majority of justices believes it had reached the wrong conclusion, precedent would have no independent value, and stare decisis would be a hollow doctrine. See F. Schauer, "Precedent," 39 Stan. L. Rev. 571, 575–76 (1987) (argument based on precedent places value on past decision merely because it was decided in past, despite present belief that past decision was erroneous); see also *Hubbard* v. *United States*, 514 U.S. 695, 716, 115 S. Ct. 1754, 131 L. Ed. 2d 779 (1995) (Scalia, J., concurring in part and concurring in the judgment) (explaining that court must give reasons for ignoring stare decisis, "reasons that go beyond mere demonstration that the overruled [decision] was wrong . . . otherwise the doctrine would be no doctrine at all"). Moreover, the oft-repeated adage that, "in most matters it is more important that the applicable rule of law be settled than that it be settled right"; *Burnet* v. *Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S. Ct. 443, 76 L. Ed. 815 (1932) (Brandeis, J., dissenting); would be empty of any meaning. In addition to placing too little value on precedent, the wrongness of a previous decision should not factor into the stare decisis calculus because it is difficult to quantify or measure the degree of a particular decision's wrongness. See J. Fisch, "The Implications of Transition Theory for Stare Decisis," 13 J. Contemp. Legal Issues 93, 105 (2003). The ability to distinguish between the degrees of wrongness of previ-

ous cases becomes necessary, however, if wrongness is part of the stare decisis calculus. That is, if a lesser degree of error is tolerable but a higher degree of error is intolerable, some mechanism is needed to measure and distinguish degrees of error; but developing such a mechanism is prohibitively difficult. See id. Thus, when we reconsider a previous decision of this court, the stare decisis framework is applied only after we have determined that the previous decision is incorrect, irrespective of how wrong it is. Moreover, the merits determination is independent of, and has no impact on, the stare decisis analysis.[8]

Under this construction of stare decisis, the fact that Chief Justice Rogers and Justice Robinson rely on the doctrine of stare decisis to uphold *Santiago* suggests that they both believe that decision is wrong. Of course, there can be no question that Chief Justice Rogers believes the decision in *Santiago* is wrong. I am unsure whether Justice Robinson believes *Santiago* is wrong because he does not tell us, but, because he did not join Justice Palmer's concurrence and instead relies on stare decisis rather than the merits to uphold *Santiago*, I am left to conclude that he likely does believe that *Santiago* was incorrectly decided.[9]

The doctrine of stare decisis naturally raises the following question: what justifies a doctrine that counsels this court to adhere to certain erroneous decisions? We have repeatedly stated that "[t]he doctrine is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency." *Conway* v. *Wilton*, supra, 238 Conn. 658–59. Moreover, "it gives stability and continuity to our case law." Id., 658. Undoubtedly, this desire to achieve stability and consistency in our law is born from respect for the rule of law. See, e.g., *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 854, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) ("[i]ndeed, the very concept of the rule of law underlying [the United States] [c]onstitution requires such continuity over time that a respect for precedent is, by definition, indispensable"). If fidelity to or concern for the rule of law justifies the doctrine of stare decisis, at least in part, then it is important that we understand what is encompassed in that ideal. At its essence, the rule of law is the concept that governmental power is exercised under, and constrained by, a framework of laws, not individual preference or ideology. J. Waldron, "Stare Decisis and the Rule of Law: A Layered Approach," 111 Mich. L. Rev. 1, 3 (2012). As Professor Randy J. Kozel aptly observed, this idea can helpfully be understood by comparison to its converse, the rule of individuals; see R. Kozel, "Settled Versus Right: Constitutional Method and the Path of Precedent," 91 Tex. L. Rev. 1843, 1857 (2013); and Thomas Paine captured the concept when he proclaimed "that

so far as we approve of monarchy, that in America the law is king. For as in absolute governments the King is law, so in free countries the law ought to be king; and there ought to be no other." T. Paine, Common Sense and Other Writings (2005) p. 44. Thus, adherence to the doctrine of stare decisis creates the appearance, and at times the reality, that this court is guided and constrained by the law—both written law, the constitution and statutes, and decisional law, the rules set forth in the decisions of this court—and not the whim of its individual members.

What should be obvious, however, is that application of stare decisis can come into tension with the rule of law as well. For example, if this court, upon later consideration, concludes that our earlier reading of a constitutional provision was incorrect but nonetheless decides, due to stare decisis, to follow that erroneous reading, we have entrenched the *rule of individuals*—those individuals who comprised this court at the time of the earlier decision—rather than the rule of law. See J. Waldron, supra, 111 Mich. L. Rev. 7. This tension is particularly problematic in the context of constitutional adjudication, in which the text of the constitution, and not the construction given to it by this court, is the binding and supreme law.[10] Id. After all, and in the words of Justice Douglas, a judge must remember, "above all else that it is the [c]onstitution [that] he swore to support and defend, not the gloss [that] his predecessors may have put on it." W. Douglas, "Stare Decisis," 49 Colum. L. Rev. 735, 736 (1949).

Perhaps because of this inherent and unavoidable tension, we have long held that stare decisis is not an absolute impediment to change in our case law. See, e.g., *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990). Instead, we have called for a balancing of the benefits and burdens of stare decisis, noting we "should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to enforce a clearly erroneous decision." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 520; see also *State* v. *Miranda*, 274 Conn. 727, 733, 878 A.2d 1118 (2005) ("there are occasions when the goals of stare decisis are outweighed by the need to overturn a previous decision in the interest of reaching a just conclusion in a matter"). Unfortunately, we have never taken the opportunity to articulate the prudential and pragmatic considerations or to outline the benefits and burdens of stare decisis. It is this task to which I now turn.

The remainder of this part of the opinion articulates a principled balancing test this court should employ when determining whether to afford stare decisis effect to a previous decision that it is convinced is wrong or about which it has serious doubts. The balancing test

I advocate includes four factors, one benefit and three costs. On the benefit side of the scale is the protection of reliance interests. The countervailing weights, that is, the costs of adhering to an erroneous judicial decision, are the (a) cost of error correction, (b) cost to the constitutional order, and (c) cost of unworkability or uncertainty. Each of these four factors will be discussed in this opinion. The analysis of each factor and the weighing of the benefit factor against the cost factors occur only after the court has concluded that the precedent in question is wrong.

1

### Benefit of Stare Decisis—Protection of Reliance Interests

At first glance, it would appear that the benefits of stare decisis are stability and constancy in the law. See, e.g., *Conway* v. *Wilton*, supra, 238 Conn. 658 ("[t]his court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law"). We have acknowledged, however, that adherence to precedent, and thereby stability and constancy, "is not an end in and of itself"; (internal quotation marks omitted) *State* v. *Salamon*, supra, 287 Conn. 520; and, therefore, there must be some other interest protected or policy served by stability and consistency that is the benefit of stare decisis.

Upon reviewing our cases and the academic literature on stare decisis, I conclude that the benefit served by stare decisis is the protection of reliance interests.[11] In fact, two of the stare decisis justifications we have articulated in the past indirectly acknowledge the importance of protecting reliance interests. As I noted previously in this opinion, stare decisis is justified because "it allows for predictability in the ordering of conduct . . . [and] promotes the necessary perception that the law is relatively unchanging . . . ." *Conway* v. *Wilton*, supra, 238 Conn. 658–59. Thus, as long as the law is predictable and relatively constant, citizens can rely on it in planning their affairs.

We have also directly recognized the importance of reliance interests when deciding whether to apply the doctrine of stare decisis. For example, in cases involving tort or criminal law, we often remark that "[t]he arguments for adherence to precedent are least compelling . . . when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants . . . ." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 523; accord *O'Connor* v. *O'Connor*, 201 Conn. 632, 644, 519 A.2d 13 (1986). In *Salamon*, this court was confronted with whether an accused could be convicted under a kidnapping statute, General Statutes § 53a-94, even though the restraint involved in the kidnapping of the victim was

incidental to the commission of another criminal offense; see *State* v. *Salamon*, supra, 513; a question we had answered in the affirmative more than thirty years earlier and reaffirmed on a number of occasions. See, e.g., *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977), overruled by *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). On that occasion, however, the court decided to reexamine, and ultimately to depart from, our settled construction of the kidnapping statute. See *State* v. *Salamon*, supra, 542. Justice Palmer, writing for a majority of the court in *Salamon*, reasoned that the court was justified in reexamining and abandoning *Chetcuti* and its progeny, in part, because there was no reason to believe that criminals had adjusted their conduct on the basis of the court's interpretation of criminal statutes. See id., 523 ("[p]ersons who engage in criminal misconduct . . . rarely if at all will . . . give thought to the question of what law would be applied to govern their conduct if they were to be apprehended for their violations" [internal quotation marks omitted]). The lack of reliance, Justice Palmer stated, weighed in favor of reconsidering the court's past cases. Id.

This court similarly cited reliance, or the lack thereof, in overruling prior precedent in *Conway* v. *Wilton*, supra, 238 Conn. 677. In *Conway*, we reconsidered whether municipalities and their employees were owners under the Connecticut Recreational Land Use Act (act), General Statutes (Rev. to 1995) § 52-557f et seq., and, therefore, entitled to immunity from liability for injuries occurring on land the municipality holds open to the public for recreational use. Id., 655, 657–58. Only four and one-half years earlier, we had determined that the statute's language was clear and unambiguous and held that municipalities were owners for purposes of the act. See *Manning* v. *Barenz*, 221 Conn. 256, 260, 603 A.2d 399 (1992), overruled by *Conway* v. *Wilton*, 238 Conn. 653, 655, 680 A.2d 242 (1996). Nevertheless, in *Conway*, we concluded that the act should not apply to municipal landowners and overruled *Manning*; *Conway* v. *Wilton*, supra, 655, 676; reasoning, in part, that it could not reasonably be supposed that the defendant municipality tailored its conduct due to our holding in *Manning*. Id., 677. Moreover, we noted that there was no evidence that municipalities across the state had decided to forgo liability insurance under the assumption that *Manning* shielded them from liability.[12] Id.

Fostering and protecting reliance interests are important because, as Professor Jeremy Waldron has commented, creating a sense that the law can be relied on allows people to better exercise their liberty. J. Waldron, supra, 111 Mich. L. Rev. 9. Although legal constraint is inescapable in the modern era, freedom is nonetheless possible, Professor Waldron states, "if people know in advance how the law will operate, and how they must act to avoid its having a detrimental impact

on their affairs." J. Waldron, "The Concept and the Rule of Law," 43 Ga. L. Rev. 1, 6 (2008). Stated differently, if the law is relatively unchanging and known, individuals can anticipate, when facing new situations, how they will be treated by the law and plan their conduct accordingly.[13]

Given the importance of reliance interests, such interests must be a central focus of our stare decisis calculus. Thus, we need to develop a framework in which to directly analyze what, if any, reliance interests a particular court precedent has engendered. The starting point, of course, is identifying the forms of reliance interests that may exist. One commentator has aptly organized these interests into four categories: specific reliance; governmental reliance; court reliance; and societal reliance. See R. Kozel, "*Stare Decisis* as Judicial Doctrine," 67 Wash. & Lee L. Rev. 411, 452 (2010).

Specific reliance arises when an individual or group conforms its behavior to rules announced by the court. For example, the United States Supreme Court has long held that stare decisis has special force in cases involving contract or property law. See, e.g., *Payne* v. *Tennessee*, supra, 501 U.S. 828 ("[c]onsiderations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved"); see also T. Lee, "Stare Decisis in Historical Perspective: From the Founding Era to the Rehnquist Court," 52 Vand. L. Rev. 647, 691–98 (1999) (tracing property and contract distinction back to early nineteenth century United States Supreme Court cases). That court has explained that cases announcing property or contract rules are entitled to greater stare decisis weight because "[everyone] would suppose that after the decision of [the] court, in a matter of that kind, [they] might safely enter into contracts, upon the faith that rights thus acquired would not be disturbed." *Propeller Genesee Chief* v. *Fitzhugh*, 53 U.S. (12 How.) 443, 458, 13 L. Ed. 1058 (1851). It has also been observed that upsetting cases that establish rules of property can be injurious to many titles because, in conveying property, individuals rely on existing property and contract rules. See, e.g., *United States* v. *Title Ins. & Trust Co.*, 265 U.S. 472, 486–87, 44 S. Ct. 621, 68 L. Ed. 1110 (1924); see also, e.g., *Ozyck* v. *D'Atri*, 206 Conn. 473, 484, 538 A.2d 697 (1988) (*Healey, J.*, concurring) (noting reason "stare decisis applies with special force to decisions affecting titles to land is the special reliance that such decisions mandate"). Conversely, we have opined that cases establishing rules of tort or criminal law receive diminished stare decisis weight, reasoning that such cases, particularly unintentional tort cases, are unlikely to influence individual behavior. See, e.g., *State* v. *Salamon*, supra, 287 Conn. 523 ("[p]ersons who engage in criminal misconduct, like persons who engage in tortious conduct, rarely if at all will . . . give thought to the question of what law would be applied

to govern their conduct if they were to be apprehended for their violations" [internal quotation marks omitted]); *O'Connor* v. *O'Connor*, supra, 201 Conn. 645 (abandoning this court's categorical allegiance to place of injury test when determining what law should apply in tort cases, reasoning that departing from precedent would not upset any expectations of litigants because they will rarely "give thought to the question of what law would be applied to govern their conduct if it were to result in injury" [internal quotation marks omitted]).

The Executive and Legislative Branches, along with local governments, also rely on this court's decisions. In *Craig* v. *Driscoll*, 262 Conn. 312, 813 A.2d 1003 (2003), Chief Justice Sullivan invoked legislative reliance in his dissent, urging the court to adhere to the status quo. See id., 348–50 (*Sullivan, C. J.*, dissenting). In *Craig*, this court created a common-law negligence action against a purveyor of alcohol who negligently serves alcohol to an intoxicated person who subsequently causes injuries to another person. See id., 314, 339–40. Prior to our holding in *Craig*, however, the general rule provided by the common law was that no such action shall lie against a purveyor of alcohol. See id., 322. Moreover, in *Quinnett* v. *Newman*, 213 Conn. 343, 344, 568 A.2d 786 (1990), overruled in part by *Craig* v. *Driscoll*, 262 Conn. 312, 813 A.2d 1003 (2003), this court held that Connecticut's Dram Shop Act occupied the field and therefore provided the injured person's sole remedy against a purveyor of alcohol for injuries caused by an intoxicated person. Nonetheless, the court in *Craig* decided to overrule *Quinnett* and the common law's long-standing general rule. *Craig* v. *Driscoll*, supra, 329. Chief Justice Sullivan contended, however, that the court should continue to decline to recognize the common-law cause of action and abide by the holding in *Quinnett*, reasoning that the legislature had enacted the Dram Shop Act in reliance on this court's common-law jurisprudence. Id., 344, 349–50 (*Sullivan, C. J.*, dissenting). In crafting a recovery scheme, the legislature was aware that no common-law cause of action ever had existed for plaintiffs to recover for the negligent service of alcohol, and, therefore, the Dram Shop Act reflected the legislature's judgment as to when such recovery should be allowed. See id., 349 (*Sullivan, C. J.*, dissenting). This court undermined the legislative scheme, however, by recognizing a common-law cause of action. See id. In such cases, according to Chief Justice Sullivan, the legislature's reliance on this court's prior precedent counseled strongly in favor of applying stare decisis.[14] Id., 349–50 (*Sullivan, C. J.*, dissenting).

The judiciary, including this court, also relies on our precedent. Under this form of reliance, our cases, as well as those of the Appellate Court and the trial courts, build on one another, resulting in the development of a doctrinal structure. Cf. R. Kozel, supra, 67 Wash. & Lee L. Rev. 459. For example, this court has established

a state double jeopardy jurisprudence that is founded on our recognition in *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962), that, despite the absence of a double jeopardy clause in the state constitution, the due process clause of article first, § 9, of the Connecticut constitution of 1818, which now appears in article first, § 8, of the Connecticut constitution of 1965, embraces a common-law rule against double jeopardy.

The final form of reliance is societal reliance. Unlike the three previous forms of reliance, societal reliance is concerned with perception, not behavior. A court's precedents, particularly its constitutional precedents, have the ability to shape a society's "perceptions about our country, our government, and our rights." R. Kozel, supra, 67 Wash. & Lee L. Rev. 460. The United States Supreme Court case of *Dickerson* v. *United States*, supra, 530 U.S. 428, is instructive. In *Dickerson*, the court considered, among other things, whether *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), should be overruled insofar as it requires the suppression of an arrestee's unwarned statements. See *Dickerson* v. *United States*, supra, 432, 443. Chief Justice William Rehnquist, writing for the court, declined to do so. Id., 443. Instead, he noted that the stare decisis principles weighed heavily against departing from *Miranda* because "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." Id. Undoubtedly, the focal point was not on individual arrestees and police officers and whether they order their behavior on the basis of *Miranda*. Instead, the court's attention was drawn to how *Miranda* warnings have pervaded American culture. See id. The court clarified this point in *Arizona* v. *Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), in referring to *Dickerson*: "In observing that *Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture . . . the [c]ourt was referring not to police reliance on a rule requiring them to provide warnings but to the broader societal reliance on that individual right." (Citation omitted; internal quotation marks omitted.) Id., 349–50. As *Dickerson* suggests, the rules, principles, and rights established by court precedent can become part of the citizenry's consciousness. See R. Kozel, supra, 67 Wash. & Lee L. Rev. 462. Disturbing such precedents may affect our understanding of government and the relationship between citizens and the government. See id.

After the court has assessed and articulated the reliance interests of each category just described, it should turn to an examination of the disruption that would be caused if the precedent relied on is overruled. An assessment of the disruptive effect of overruling precedent considers the adjustment costs that would arise

from the need to modify behavior tailored to conform with the precedent the court is contemplating overruling. See R. Kozel, "Precedent and Reliance," 62 Emory L.J. 1459, 1486 (2013). Questions the court might consider when evaluating disruption costs include whether the overruling would (1) create a need for significant restructuring of corporate organizations or commercial transactions, (2) call into question the enforceability of contracts or title to real property, (3) cause a significant reordering of individual conduct, including risk shifting arrangements such as insurance policies, (4) upset a duly enacted legislative scheme and require the development of a new regulatory regime, (5) undermine the foundational decisions of a robust judicial doctrine, and (6) affect the broader, societal understanding of our constitutional system. Assessing the reliance engendered by a previous case and the costs that would arise from overruling such a case is the first step this court should undertake in balancing the benefit and costs of applying stare decisis to that case.

## 2

### Costs of Stare Decisis

Once the benefit of applying stare decisis and adhering to precedent has been uncovered and quantified, the court must consider the burdens of applying stare decisis. Generally speaking, the burdens of applying stare decisis are the costs that result from perpetuating judicial error. As I noted previously in this opinion, there are three costs for the court to consider, and I will consider each in turn.

When evaluating the costs that would result from preserving judicial error, we should begin by considering the nature of the judicial error. This involves a two part test. First, we must ask whether the error was constitutional or statutory, because the cost of error will vary depending on the nature of the error. This I will call the cost of error correction. Second, if the error is constitutional, we must consider if and how such error disrupts the constitutional order. This will be referred to as the cost to the constitutional order.

### a

### Cost of Error Correction

The United States Supreme Court has long recognized that stare decisis has diminished force when the precedent in question interprets or applies the constitution, as opposed to a statute. See, e.g., *Burnet* v. *Coronado Oil & Gas Co.*, supra, 285 U.S. 406–407 (Brandeis, J., dissenting) ("in cases involving the [f]ederal [c]onstitution . . . [the] [c]ourt has often overruled its earlier decisions"); see also *Agostini* v. *Felton*, 521 U.S. 203, 235, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (noting that stare decisis "is at its weakest" in constitutional adjudications). The court has justified this constitutional-statutory dichotomy by explaining the relative

difficulty of correcting constitutional error as compared to correcting statutory error. See, e.g., *Agostini* v. *Felton*, supra, 235. When a court reaches an erroneous conclusion about the meaning or application of the constitution, such an error can be corrected only by judicial decision or constitutional amendment. See id. Conversely, when a court improperly interprets a statute, the legislature, through a simple majority, can correct such error. See *Burnet* v. *Coronado Oil & Gas Co.*, supra, 406 (Brandeis, J., dissenting). At least one justice of this court has, in the past, approved of this reasoning. See *State* v. *Lawrence*, supra, 282 Conn. 187 (*Katz, J.*, dissenting) ("it is well recognized that, in a case involv[ing] an interpretation of the [c]onstitution . . . claims of stare decisis are at their weakest . . . where [the court's] mistakes cannot be corrected by [the legislature]" [internal quotation marks omitted]). Although the court does not discuss it in these terms, it can fairly be said that the preservation of judicial constitutional error imposes greater costs than the preservation of statutory error due to the limited recourse of the people to correct such error. See K. Lash, "The Cost of Judicial Error: Stare Decisis and the Role of Normative Theory," 89 Notre Dame L. Rev. 2189, 2195–97 (2014). Professor Kurt T. Lash has explained that, "[b]ecause remedying judicial errors involving constitutional interpretation remains beyond the ordinary reach of the democratic process, this heightens the potential 'cost' of such errors." Id., 2196. The cost of correcting constitutional error in Connecticut is particularly significant due to our onerous constitutional amendment process, which allows Connecticut citizens to directly call for constitutional change only once every twenty years.[15]

b

Cost to the Constitutional Order

The preservation of judicial constitutional error may result in costs beyond those arising from the difficulty of correcting such an error. Such costs result when a judicial decision alters or disturbs the state polity. A brief digression into our constitutional history and theory is needed to better understand this harm.

A fundamental principle of American government and constitutions, including the constitutions of the many states, is popular sovereignty. See A. Amar, "The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem," 65 U. Colo. L. Rev. 749, 749–51 (1994). In essence, popular sovereignty is the theory that, in a free society, the people hold the power, and the government has only that power the people delegate to it. Id., 762–66 (explaining founding era understanding of republican government). The delegation of power occurs through the adoption of a constitution, which establishes the government and delegates the power among the branches. See id., 764. Through this delegation, the peo-

ple may reserve certain rights to themselves, limiting the government's power to act in particular areas. Also central to popular sovereignty is the people's ability to alter or abolish the established government, a right they exclusively hold. See id., 749, 762–64. That is, only the people, and not the governmental institutions they have ordained, can alter the structure and powers of government. See id.

The colonial citizens of Connecticut were no strangers to the ideals embodied in popular sovereignty. In fact, evidence dating back to the 1630s demonstrates that the populace of the Connecticut colony adopted the popular sovereignty principles. See, e.g., W. Horton, "Law and Society in Far-Away Connecticut," 8 Conn. J. Intl. L. 547, 549–50 (1993). In a 1638 sermon, Puritan Reverend Thomas Hooker expounded on these principles. See H. Cohn, "Connecticut Constitutional History: 1636–1776," 64 Conn. B.J. 330, 332–33 (1990). Specifically, Reverend Hooker stressed that the civil power resided with the people, the people had the authority to elect their political leaders, and the people established the limits within which their political leaders could act. See id. This sermon, it is argued by many, was the catalyst of the Fundamental Orders of 1639.[16] See, e.g., id., 333–34; see also W. Horton, The Connecticut State Constitution: A Reference Guide (2d Ed. 2012) p. 5. The Fundamental Orders contained "the germs of a great principle—the principle of self-government based on a limited measure of popular control." (Internal quotation marks omitted.) H. Cohn, supra, 335. This form of government and the popular sovereignty principles on which it was founded continued under the Charter of 1662,[17] after Connecticut's signing of the Declaration of Independence in 1776,[18] and are embodied in the 1818 and 1965 state constitutions. Indeed, the principle is explicitly expressed in article first, § 2, of the Connecticut constitution: "All political power is inherent in the people, and all free governments are founded on their authority . . . ."

With this historical and theoretical background in mind, I return to discussing the costs inherent in following erroneous constitutional decisions. In constitutional adjudication, we must take special care to ensure that we are enforcing the will of the people as expressed in their constitution. Because the ultimate power rests in the people and has been allocated to the separate branches of government, it is our duty to ensure that each branch, including the judiciary, does not usurp the power of its coequal branches. It is especially important that we take pains to restrain *this branch*, because a usurpation of legislative or executive power is, in effect, a usurpation of the people's power. It is true that the constitution entrenches certain fundamental principles, such as the freedom of the press, to immunize them from majoritarian control; however, most political and policy questions have been left to democratic rule, that

is, majority control through the elected branches of government. In such cases, the people exercise their power and carry out or vindicate their will at the ballot box. Thus, it is essential that we not immunize from majoritarian control those questions that the people have left to the political process. To do so would be to misappropriate the power of the people.[19]

When we erroneously interpret or apply the constitution in ways that upset the governmental structure or intrude on the democratic process by frustrating the majoritarian government, we levy a cost on the constitutional order. See, e.g., K. Lash, "Originalism, Popular Sovereignty, and *Reverse* Stare Decisis," 93 Va. L. Rev. 1437, 1442 (2007). Professor Lash provides a taxonomy that is helpful in understanding and evaluating such errors and the costs they impose. See id., 1457–61. He organizes judicial error in constitutional cases into two broad parameters, namely, intervention versus nonintervention, and immunity versus allocation. Id., 1454. He explains his classifications as follows: "First, courts may wrongfully intervene in the political process or they may wrongfully fail to intervene. Second, judicial error may involve a question of immunity (whether the government has any power over a given subject) or a question of allocation (which governmental institution has power over a given subject)." (Emphasis omitted.) Id. The degree of harm imposed on popular sovereignty and the constitutional order, of course, varies with the type of error; see id., 1457–61; and, as Professor Lash explains, depends on how intrusive the error is on the political process. See id., 1456–57.

I will begin with errors of allocation that, generally speaking, impose the smallest amount of harm on our constitutional order. See id., 1457–58. Allocation cases are those involving questions of separation of powers. See id., 1455. When the court erroneously allocates power to the wrong branch of government, the harm is minimal because, in most cases, the political process can correct such error. See id., 1457. For example, if we incorrectly determine that the Executive Branch has a power the constitution does not grant that branch, the people can reject such error by electing a governor who will not exercise the wrongly allocated power. Id., 1457–58. Allocation errors that appropriate power to the judiciary from the political branches are more problematic due to the court's insulation from the political process. See id., 1455, 1458. In such cases, the costs inflicted on the constitutional system are dependent on the ability of the other branches to correct such error. See id., 1458. For example, if the judicial usurpation of authority can be corrected through the General Assembly's ability to define the jurisdiction of the court, the costs are minimal. See id.; see also Conn. Const., art. V, § 1 ("[t]he powers and jurisdiction of these courts shall be defined by law"). If, however, the political process cannot correct such error, the costs are significant

and of the same kind as discussed in erroneous cases of immunity intervention, which I discuss subsequently in this opinion. See K. Lash, supra, 93 Va. L. Rev. 1458.

Cases of immunity involve the question of whether a particular issue is subject to political resolution; see id.; that is, whether the constitution has entrenched a principle, such as the freedom of the press, or left a question to the democratic process, such as general economic legislation. Immunity errors come in two forms, nonintervention and intervention. See id., 1459. A nonintervention error imposes fewer costs on the constitutional order than does an intervention error. See id. Erroneous nonintervention occurs when the court fails to intervene, thereby overlooking a principle entrenched in the constitution and leaving it to the political process. See id., 1454, 1459. Such error does undermine the legitimacy of our constitutional system by allowing a simple majority in the General Assembly to trump the entrenched will of the people; nonetheless, the costs generated by erroneous nonintervention are limited because the issue remains subject to majority control. See id., 1459. Thus, if the court fails to protect a right entrenched in the constitution, the people can mobilize and, through the General Assembly, act to protect such right through legislation. See id.

On the other hand, intervention error occurs when the court entrenches a principle in the constitution that, under a proper reading of the document, has no constitutional status. See id., 1455. Such error inflicts the greatest costs on popular sovereignty and the constitutional order because it often removes from the political process an issue that the constitution left to that process. See id., 1460–61. Worse yet, the people have only one avenue to correct such error, namely, constitutional amendment, which requires either supermajoritarian action by the General Assembly or awaiting the electorate's next opportunity to call a constitutional convention.[20] See footnote 15 of this opinion.

In sum, judicial error in constitutional cases can frustrate the ideals of popular sovereignty and majority rule, thereby disturbing the constitutional order. The costs imposed by such a disruption should factor into this court's stare decisis calculus. Cases that involve the greatest costs are those of erroneous immunity intervention and erroneous usurpation of power by the court; in those cases, such usurpation cannot be corrected or mitigated by the political branches.[21]

c

Cost of Unworkability or Uncertainty

Perpetuating unworkable rules or uncertain judicial decisions also imposes costs. This principle naturally flows from the justifications for stare decisis. That is, if stare decisis is a defensible doctrine because it creates predictability and stability in the law; see, e.g., *Conway*

v. *Wilton*, supra, 238 Conn. 658; then decisions that create uncertainty "undermine, rather than promote, the goals that stare decisis is meant to serve." *Johnson* v. *United States*,     U.S.     , 135 S. Ct. 2551, 2563, 192 L. Ed. 2d 569 (2015). It would be ironic to adhere to an uncertain precedent under the guise of stare decisis. Often, this principle arises when the court finds a previously announced rule to be unworkable or when it discovers that a particular precedent has come into conflict with another case or line of cases.[22] There is no reason, however, why the same principle should not apply when a case, despite not being unworkable or creating conflict in court jurisprudence, creates uncertainty. See, e.g., *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 379, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (Roberts, C. J., concurring) ("[I]f adherence to a precedent actually impedes the stable and orderly adjudication of future cases, its stare decisis effect is also diminished. This can happen in a number of circumstances, such as when the precedent's validity is so hotly contested that it cannot reliably function as a basis for decision in future cases . . . and when the precedent's underlying reasoning has become so discredited that the [c]ourt cannot keep the precedent alive without jury-rigging new and different justifications to shore up the original mistake."); *United States* v. *Dixon*, 509 U.S. 688, 711–12, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (overruling earlier case in part because it created confusion).

In summary, under this framework, the court weighs the benefit and costs of adhering to prior cases. The court would employ a four step test in assessing whether to adhere to stare decisis. In step one, the court will consider the merits of the case under reconsideration. If it concludes that the previous case is correct, it will reaffirm that decision on the merits, and the inquiry will end. On the other hand, if the court should conclude that the previous decision is wrong, it should continue on to steps two through four. In step two, the court will analyze the benefit of adhering to the precedent case. This analysis involves the evaluation of one factor, namely, the reliance interests. In assessing whether the case being reconsidered has engendered any reliance, the court must methodically work through each category of reliance interests—specific, governmental, court, and societal—and catalog how each group has ordered its behavior on the basis of the erroneous decision. It must further assess what disruption would result if the case is overruled. Next, in step three, the court would evaluate the costs of adhering to the erroneous decision, which requires the evaluation of three factors. Those factors include the (a) costs of correcting the judicial error, (b) costs the error imposes on the constitutional order, and (c) costs of unworkability or uncertainty. After the costs have been identified and evaluated, the court will move to the fourth and

final step: the court would compare the benefit to the costs of adhering to the decision. If the reliance interests and the disruption costs that would arise from overruling the decision outweigh the costs of perpetuating judicial error, the previous decision will be afforded stare decisis effect, and the court will be bound to follow it. If, however, the costs of preserving judicial error outweigh any reliance interests, the decision under reconsideration will be afforded no stare decisis effect, and it should be overruled.

## B

### Application of Principled Doctrine of Stare Decisis to *Santiago*

The court's adoption of the four step test outlined in part I A of this opinion would result in a more consistent and principled application of the doctrine of stare decisis. In fact, applying this approach would shield this court from the appearance that the doctrine of stare decisis is used as a tool to reach a preferred result. I will now apply this framework in the present case to consider whether stare decisis should be applied to our decision in *Santiago*.

### 1

### Step One: The Merits of *Santiago*

As I previously observed, it would serve no purpose to lengthen this dissent with further explanation as to why *Santiago* was wrongly decided. Instead, it suffices to say that, for the reasons Chief Justice Rogers, Justice Espinosa, and I provided in our dissenting opinions in *Santiago*, that decision was wrong then and continues to be wrong now.

### 2

### Step Two: The Lack of Reliance *Santiago* Has Engendered

In part I A of this opinion, I explained that reliance interests can generally be placed into four categories: specific reliance; governmental reliance; court reliance; and societal reliance. I will consider each category in turn.

It cannot genuinely be argued that *Santiago* has garnered any specific reliance. The individuals currently on death row have not acted in reliance on our holding in *Santiago*. Indeed, the conduct that resulted in their convictions and death sentences occurred long before we issued our decision in *Santiago*. Moreover, we have often stated that stare decisis has less force in criminal cases precisely because those cases do not beget reliance interests. E.g., *State* v. *Salamon*, supra, 287 Conn. 523. For example, Justice Palmer wrote for the majority in *Salamon*: "Persons who engage in criminal misconduct . . . rarely if at all will . . . give thought to the question of what law would be applied to govern their

conduct if they were to be apprehended for their violations." (Internal quotation marks omitted.) Id. Some might suggest that there has been specific reliance on *Santiago* because certain death row inmates have filed motions to vacate their death sentences. That argument misses the mark. The relevant conduct, the commission of a capital crime, was committed before this court decided *Santiago*. That certain inmates are now trying to capitalize on this court's error is simply opportunistic.

There similarly has been no governmental or court reliance. Neither the Legislative Branch nor the Executive Branch has taken action in the wake of and in reliance on *Santiago*. The legislature has not enacted a new punishment scheme for capital crimes, and the governor has not taken steps to implement a new punishment scheme. Cf. *Craig* v. *Driscoll*, supra, 262 Conn. 349 (*Sullivan, C. J.*, dissenting) ("the doctrine of stare decisis has particular force in this case because of the long-standing nature of the common law [on] which our legislature has relied in crafting the remedies available to parties such as the plaintiffs"). Moreover, neither this court nor any other court in this state has relied on *Santiago* to decide cases. Significantly, a judicial doctrine has not been built on the foundation of *Santiago*. In fact, courts that have been asked to apply the central holding of *Santiago* have elected to stay the proceedings and to await our decision in the present case.

Finally, *Santiago* has not amassed any societal reliance. As I discussed previously, societal reliance refers to the people's perception of our constitutional system and the relationship between themselves and government. The people of Connecticut have hardly had time to absorb our decision in *Santiago*, and, thus, there has been little time for that decision to become part of Connecticut's consciousness. *Santiago* simply has not garnered, at least presently, the same level of social and historical significance as the United States Supreme Court's decisions in, for example, *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), or *Miranda* v. *Arizona*, supra, 384 U.S. 436, and it would be disingenuous to suggest otherwise. The principles expounded on in *Brown* have become part and parcel of who we are as a society, and *Miranda* is central to the people's understanding of their relationship with law enforcement. It cannot seriously be suggested that *Santiago* has reached the same, or even similar, status. Whether the people of this state and country believe that capital punishment is, in all cases and under all circumstances, unconstitutional is far from a foregone conclusion, and, therefore, *Santiago* does not represent a foundational legal norm.

Clearly, there is not a scintilla of reliance on *Santiago*. Neither society nor the government has changed its

behavior to comport with that decision. Moreover, *Santiago* is far from being part of our state consciousness. Even if it could be argued that there has been some reliance on *Santiago*, such reliance would surely be unreasonable. This court's decision in *Santiago* was released August 25, 2015, at a time when the present appeal was pending. On September 4, 2015, the state filed a motion for argument and reconsideration of our decision in *Santiago*, a motion we denied on October 7, 2015. See *State* v. *Santiago*, supra, 319 Conn. 912. *On that very day*, we also ordered supplemental briefing in this case, addressing, among other things, the effect of the judgment in *Santiago*. Thus, in an apparent moment of double speak, this court declined to reconsider *Santiago* and called its legitimacy into question. What's more, the judgment in *Santiago* was not even final when we ordered supplemental briefing in this case. See *State* v. *Santiago*, 319 Conn. 935, 125 A.3d 520 (2015) (denying state's motion for stay of judgment on October 30, 2015).

In light of the complete lack of reliance on *Santiago*, there is no need to consider the disruptive effect that overruling *Santiago* would have. Obviously, if there has been no reliance, there are no reliance interests to disrupt.

3

Step Three: Assessing the Costs of
Perpetuating *Santiago*'s Error

Because there has not been even the slightest bit of reliance on *Santiago*, only the most trivial of costs will be necessary to tip the scale in favor of not affording stare decisis effect to *Santiago*. The costs of preserving *Santiago*, however, are stifling, not trivial. I will address each of the three costs outlined previously in this opinion. Those costs are the costs of error correction, costs to the constitutional order, and costs of unworkability or uncertainty.

a

The Uncertainty of *Santiago*

For the sake of brevity and clarity, I will first consider the creation of uncertainty. There is a great irony in arguing that the dictates of stare decisis would have this court stand by a previous case that creates uncertainty. *Santiago* is such a case. I do not suggest—nor could I—that *Santiago* announced an unclear rule of law or a test that will be unworkable in future cases. Nonetheless, the majority opinion in that case created an immense ambiguity, an ambiguity that has left a dark cloud of uncertainty over the powers of government.

The uncertainty arises from the majority's mode of analysis. In order to determine that the death penalty is now offensive to our state constitution, the majority employed a hybrid analysis of its own creation. As I noted in my dissent in *Santiago*, the majority's

approach in that case fell somewhere between a per se analysis and a statutory analysis; *State* v. *Santiago*, supra, 318 Conn. 342 (*Zarella, J.*, dissenting); and, under that approach, the majority reached the amorphous conclusion that, in light of the legislature's adoption of P.A. 12-5, the death penalty no longer comports with the state's contemporary standards of decency, no longer serves any legitimate penological purposes, and, therefore, is prohibited by the state constitution. See id., 9.

I admit that parsing the 140 page majority opinion in *Santiago* can be a difficult and, at times, perplexing task. After giving that decision careful, thorough, and thoughtful consideration, however, I concluded that the majority had not determined that the death penalty is per se unconstitutional, and the majority in *Santiago* had not disputed that conclusion. See id., 341–42 (*Zarella, J.*, dissenting). Although the majority in *Santiago* never explicitly states that its holding was not per se, it seemed to suggest as much. For example, in a footnote, the majority acknowledged that "society's standards of decency need not always evolve in the same direction. We express no opinion as to the circumstances under which a reviewing court might conclude, on the basis of a revision to our state's capital felony statutes or other change in these indicia, that capital punishment again comports with Connecticut's standards of decency and, therefore, passes constitutional muster." Id., 86 n.88. A logical reading of this passage suggests that some action short of a constitutional amendment, such as a repeal of P.A. 12-5, would suffice to render the death penalty constitutional in Connecticut. In addition, the majority concluded its decision by holding "that capital punishment, *as currently applied*, violates the constitution of Connecticut." (Emphasis added.) Id., 140. A plurality of justices in the present case, however, has caused me to query whether my reading of the majority opinion in *Santiago* was incorrect. Justice Palmer, the author of the majority opinion in *Santiago*, and two other members of the majority in *Santiago* now maintain that, "[i]f the people of Connecticut believe that we have misperceived the scope of [the state] constitution, it now falls on them to amend it." Text accompanying footnote 21 of Justice Palmer's concurring opinion. If, however, the holding in *Santiago* was not per se, why is a constitutional amendment necessary to reinstate capital punishment? The plurality notes that the issue of whether capital punishment may be reinstated in this state by means other than a constitutional amendment is not before us in this case; see footnote 21 of Justice Palmer's concurring opinion; and, therefore, the plurality expresses no opinion on that question. See id. The plurality simply creates further confusion regarding the ultimate holding in *Santiago*.

It is now obvious that *Santiago* has created a great degree of uncertainty, and continuing that uncertainty will impose costs. It is true that this court's decisions

will often generate some amount of uncertainty. That uncertainty, however, concerns whether the law announced in a case will apply under different factual circumstances. For example, in *Campos* v. *Coleman*, 319 Conn. 36, 57, 123 A.3d 854 (2015), this court recognized a cause of action for loss of parental consortium. The court did not decide, however, the outer limits of that claim. See, e.g., id., 46. We did not determine whether a stepchild, who has not been legally adopted by his or her stepparent, would be permitted to bring such a claim if the stepparent is injured. Id. In addition, we left open whether the cause of action extends to parental type relationships in which the parental figure is not a biological or legal parent of the child. Id. Thus, our decision in *Campos* created some degree of uncertainty as to the extent of liability in certain tort cases. This type of uncertainty, however, is to be expected, and is tolerable, particularly in common-law adjudication, where incremental development of the law is preferred. The uncertainty created by *Santiago*, and evinced by Justice Palmer's concurring opinion in the present case, however, is of a different kind and degree. Due to the meandering reasoning in *Santiago*, members of the legislature, as well as this court, are uncertain of what, if any, authority the legislature has to enact a capital felony statutory scheme in the future. This uncertainty is intolerable and imposes significant costs on our system of government.

b

*Santiago*'s Tax on Our Constitutional Order

Closely related to the cost of this uncertainty are the costs *Santiago* places on our constitutional order. When a judicial decision erroneously immunizes an issue from majoritarian control and mistakenly allocates power to the judiciary, when such allocation cannot be corrected by majoritarian action, it taxes our constitutional order greatly. See K. Lash, supra, 93 Va. L. Rev. 1458, 1460–61.

I will first address *Santiago*'s specious immunization of capital punishment from majoritarian control. I will explain how the court has created a constitutional right when none existed. It will then be necessary, due to the contorted reasoning of the majority in *Santiago*, to consider whether the issue of capital punishment has been removed from majoritarian control.

In concluding that the death penalty is unconstitutionally cruel and unusual, the majority in *Santiago* created a right that is not grounded in Connecticut's constitution. As I explained in my dissent in *Santiago*, a cursory textual analysis of the constitution reveals numerous references to capital punishment and capital offenses.[23] *State* v. *Santiago*, supra, 318 Conn. 353–55 (*Zarella, J.*, dissenting). The entrenchment of these references in our state constitution suggests that the peo-

ple of Connecticut have conferred on their government the power to impose the ultimate punishment. More specifically, they bestowed that authority on the legislature. See, e.g., *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976) ("the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment . . . within the limits and according to the methods therein provided"). The majority in *Santiago* swept away those textual references by suggesting they were "incidental" and "merely acknowledge that the penalty was in use at the time of drafting . . . [and] do not forever enshrine the death penalty's constitutional status as standards of decency continue to evolve . . . ." *State* v. *Santiago*, supra, 131. In so doing, however, the majority ignored two important events. First, the delegates to the 1965 constitutional convention expressly rejected a proposed amendment that would have made capital punishment unconstitutional. Journal of the Constitutional Convention of Connecticut 1965, p. 111. Second, in 1972, article first, § 19, of the Connecticut constitution was amended to provide that "no person shall, *for a capital offense*, be tried by a jury of less than twelve jurors without his consent." (Emphasis added.) Conn. Const., amend. IV. In light of these events, it cannot be said that the constitutional references to capital punishment are merely incidental. Together, the textual references to capital punishment and capital crimes, and the rejection of the proposed abolition of the death penalty at the 1965 constitutional convention, entrench capital punishment in our state constitution, thereby requiring a constitutional amendment to make the death penalty unconstitutional under all circumstances.[24] Moreover, by embedding the death penalty in the state constitution, the people expressed their opinion that the punishment is not, and cannot be, per se unconstitutional.

Although it is clear that *Santiago* created a right not provided by the constitution, it is less clear whether it immunizes capital punishment from majoritarian control. As I discussed previously in this part of my opinion, the precise holding of *Santiago* is uncertain. In that case, the majority seemed to suggest that whether the death penalty could be imposed remained subject to majoritarian decision. See, e.g., *State* v. *Santiago*, supra, 318 Conn. 86 n.88 ("[w]e express no opinion as to the circumstances under which a reviewing court might conclude . . . that capital punishment again comports with Connecticut's standards of decency"). In the present case, however, Justice Palmer, along with two other justices, suggests that, under *Santiago*, the death penalty may be per se unconstitutional and that perhaps capital punishment may be reinstated through constitutional amendment only. See text accompanying footnote 21 of Justice Palmer's concurring opinion. If this latter reading is correct, preserving the error in *Santi-*

*ago* will impose significant costs on the constitutional order because it has removed from the political process a matter that the constitution has expressly left to that process. If, on the other hand, the former reading is correct, and capital punishment can be reinstated by the legislature—for example, by repealing P.A. 12-5—then the costs of this court's error, although still existent, are less significant. This uncertainty surely has a chilling effect on the legislature. Even if the legislature has the authority to reinstate the death penalty, it may be reluctant to do so for fear that such action is unconstitutional under the majority's reasoning in *Santiago*. This chilling effect increases the costs that arise from continued adherence to *Santiago*.

Regardless of whether *Santiago* immunizes capital punishment from majoritarian control, it does impose allocation costs on the constitutional order. Moreover, the allocation error cannot be corrected through majoritarian action and, therefore, levies substantial costs on the constitutional order. As I just explained, the people have enshrined capital punishment with constitutional status. Furthermore, defining crime and fixing punishment are part of the legislative, not judicial, power. See, e.g., *State* v. *Darden*, supra, 171 Conn. 679–80. Thus, by conferring the legislative power on the General Assembly, the people determined that it is that body who shall define capital crimes. See Conn. Const., art. III, § 1 ("[t]he legislative power of this state shall be vested in . . . the general assembly"). It is true that the General Assembly, when defining crime and fixing punishment, must act within the limits of the constitution; *State* v. *Darden*, supra, 679–80; and one limit the constitution places on the legislature's power to define crime and to fix punishment is the prohibition on cruel and unusual punishment. See, e.g., *State* v. *Ross*, 230 Conn. 183, 246, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). In sum, the people have determined that capital punishment is, at least in certain circumstances, constitutional. They expressed such belief in our constitution. Moreover, the people granted the General Assembly the power to define capital crimes. At the same time, however, the people implicitly prohibited the imposition of cruel and unusual punishment, a prohibition enforced by the Judicial Branch. Even if it is assumed, for the sake of argument, that the constitutional provision generally prohibiting cruel and unusual punishment is inconsistent with the enshrining of capital punishment with constitutional status, it is rudimentary that we read conflicting provisions of statutes and of the constitution, so far as is possible, to be consistent and to give effect to every word and provision thereof. Thus, the most probable reading of these seemingly conflicting commands is that the people determined that capital punishment is a constitutional punishment for the most heinous of crimes. In so doing, they deter-

mined that there are particular situations in which the death penalty is a constitutional punishment. Thus, under our current constitution, the death penalty cannot be held unconstitutional in all cases and under all circumstances. In addition, the people left for the legislature the decision of which crimes shall be capital crimes. Of course, in the exercise of that power, the legislature could determine that it will not impose the death penalty as a punishment for any crime. Moreover, the legislature's power is checked by our duty to enforce the prohibition against cruel and unusual punishment. In this context, our duty is limited to determinations of whether the death penalty is unconstitutional as applied to certain crimes or certain persons, or as carried out, and not whether the death penalty, in and of itself, is cruel and unusual. In *Santiago*, we exceeded the outer bounds of this duty by determining that the death penalty no longer comports with the state's contemporary standards of decency and by concluding that it thus can never be imposed. Our decision was not limited to an as applied determination. Thus, we have usurped the power of the legislature to define capital crimes and to fix the appropriate punishment.

To compound our affront to the legislature's power, this court's power grab cannot be corrected through majoritarian action. Even if it is assumed that the legislature could reinstate the death penalty by, for example, repealing P.A. 12-5, it appears that the ultimate decision regarding whether the constitution permits the imposition of capital punishment rests with this court. The majority in *Santiago* stated: "We express no opinion as to the circumstances under which *a reviewing court* might conclude . . . that capital punishment again comports with Connecticut's standards of decency and, therefore, passes constitutional muster." (Emphasis added.) *State* v. *Santiago*, supra, 318 Conn. 86 n.88. And, in the present case, a plurality of justices suggests that reinstating the death penalty may require a constitutional amendment, but it reserves that question for another day. See footnote 21 and accompanying text of Justice Palmer's concurring opinion. The majority in *Santiago* contorted our constitutional order by concluding that this court will decide when the death penalty, in and of itself, is again constitutional. See *State* v. *Santiago*, supra, 86 n.88. As I have explained, our constitution enshrined capital punishment with constitutional status and left to the legislature decisions regarding if and when it should be imposed, subject to limited, as applied, review by this court. Now, however, the legislature cannot reinstate a capital punishment scheme *at all* without the approval of this court or perhaps, as the plurality states, only through a constitutional amendment. This is an intolerable seizure of legislative power by this court, an error that apparently can be corrected through constitutional amendment only. Thus, the only reasonable conclusion I can reach is that

continuing to follow the erroneous decision in *Santiago* will levy great costs on the constitutional order of Connecticut because, in that decision, this court altered the balance of power created by the people.

c

### The Costs of Correcting *Santiago* Are Likely Significant

Finally, I turn to the difficulty of error correction and the costs it imposes. Erroneous constitutional decisions create greater costs than erroneous statutory or common-law decisions because of the difficulty in correcting such error. See, e.g., *Agostini* v. *Felton*, supra, 521 U.S. 235 (stare decisis "is at its weakest when [a court] interpret[s] the [c]onstitution because [its] interpretation can be altered only by constitutional amendment or by overruling [its] prior decisions"). When we improperly interpret the constitution, that error can be corrected only by constitutional amendment or by decision of this court. E.g., id. When, on the other hand, we improperly interpret or apply a statute or common-law rule, the legislature can correct our mistake through simple, majoritarian action. Thus, because *Santiago* is a constitutional decision, perpetuation of its error will impose a significant cost. Even if the legislature could reinstate the death penalty notwithstanding our decision in *Santiago*, the damage caused by the decision would remain. Without a constitutional amendment or the overruling of *Santiago*, the reasoning of that case will remain intact. If the reasoning remains, so does the usurpation of legislative power, because, in *Santiago*, the majority indicated that *a reviewing court* would serve as the arbiter of whether and when capital punishment will again comport with contemporary standards of decency in Connecticut. The difficulty of correcting our error, therefore, is significant, particularly given the restrictive method of constitutional amendment in Connecticut. See footnote 15 of this opinion.

4

### Step Four: Weighing the Benefit and Costs of Affording *Santiago* Stare Decisis Effect

The imbalance between the reliance interests that would be protected and the costs that would result from adhering to *Santiago* is so clear that I almost need not express it. The weighing in the present case is akin to using an elephant (costs of giving stare decisis effect to *Santiago*) as a counterweight for a mouse (reliance interests). In all actuality, using a mouse to represent the reliance interests at stake is far too generous. Not a single individual or institution, including this state's government, has acted in reliance of our decision in *Santiago*. In fact, that decision's legitimacy was placed on shaky ground from the beginning because we ques-

tioned its precedential effect before the judgment in that case was final; see *State* v. *Santiago*, supra, 319 Conn. 935 (denying state's motion for stay of judgment); and, therefore, even if there had been any reliance on *Santiago*, it would have been unreasonable. The costs of adhering to that decision, however, are astronomical. First, and most significant, *Santiago* has upset the balance of governmental power created by our constitution. In that case, this court took for itself a power that always has resided in the legislature. Moreover, the only way to restore the equilibrium of governmental power is by amending the state constitution, which is no easy task. Second, the ultimate holding of *Santiago* is unclear. Third, that decision may or may not have immunized capital punishment from majoritarian control, despite the people's intention, expressed through the constitution, to allow the democratic and political processes to determine if and when the ultimate punishment might be imposed. Finally, if this court does not now overrule *Santiago*, a constitutional amendment is the only certain way to correct this court's overreaching. On balance, it is clear that the costs far outweigh the benefit of applying stare decisis to *Santiago*, and therefore, that decision should be overruled.[25]

## II

### THE COURT'S INSTITUTIONAL LEGITIMACY

In their concurring opinions, Chief Justice Rogers and Justice Robinson focus primarily on concerns over this court's legitimacy. Chief Justice Rogers argues that overruling *Santiago* within one year of deciding that case simply because there has been a change in court membership would call into question the integrity of this court and our commitment to the rule of law. Similarly, Justice Robinson concludes that the present case turns on the "stare decisis considerations of this court's institutional legitimacy and stability . . . ." Text accompanying footnote 2 of Justice Robinson's concurring opinion. He continues by stating that, if this court were to now overrule *Santiago*, it would appear that an important constitutional case was retracted simply due to a change in court personnel. I am not unsympathetic to my colleagues' concerns over the legitimacy of the court. Indeed, I agree that it would be a travesty if we were to overrule our previous cases simply because they no longer comport with the personal and ideological beliefs of a majority of the justices of this court. That, however, is not this case. Moreover, the idea that we may subordinate our oath to uphold the constitution to concerns about this court's public appearance is incomprehensible. See Conn. Const., art. XI, § 1.

The arguments in the concurring opinions of Chief Justice Rogers and Justice Robinson rest on faulty premises. First, they both seem to suggest that overturning court precedent is inconsistent with the rule of law. For example, Chief Justice Rogers apparently feels

bound by *Santiago* because of her "respect for the rule of law," and Justice Robinson concludes that we should follow *Santiago* because to do otherwise "would imperil our state's commitment to the rule of law . . . ." Second, and far more bizarre, Chief Justice Rogers and Justice Robinson contend that the change in court membership is an insufficient reason to overturn *Santiago* in the present case. Of course, I agree that a change in court personnel cannot justify overruling an earlier decision; that fact, however, would not serve as the basis for overruling *Santiago*. Instead, we would overrule *Santiago* because, one, the reasoning of the majority opinion in that case was inherently flawed and led to an erroneous conclusion, and, two, a weighing of the benefit and costs of applying the doctrine of stare decisis dictates that it should not be applied to our decision in *Santiago*.

I will further expound on the flaws in both of these premises, but, before I do, I will briefly explain from what source the court derives its legitimacy. This court's legitimacy arises from the willingness of the people of Connecticut to accept and obey the court's decisions and is "a product of substance and perception . . . ." *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 505 U.S. 865. That acceptance is a product of our fidelity to the rule of law, that is, our "legitimacy depends on making *legally principled decisions* under circumstances in which their principled character is sufficiently plausible to be accepted by the [people of this state]." (Emphasis added.) Id., 866; see also T. Tyler & G. Mitchell, "Legitimacy and the Empowerment of Discretionary Legal Authority: The United States Supreme Court and Abortion Rights," 43 Duke L.J. 703, 796–99 (1994) (concluding, after literature review and empirical study, that United States Supreme Court's contention in *Casey* that judicial legitimacy comes from objective and neutral decision-making finds strong support). Stated differently, the court receives and maintains its legitimacy by deciding cases through the objective and dispassionate application of the law and by ignoring how such cases will be perceived by the public. Cf. *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 958 (Rehnquist, C. J., concurring in the judgment in part and dissenting in part).

It appears that Chief Justice Rogers and Justice Robinson understand that this institution's legitimacy comes from a fidelity to the rule of law. They take the argument one step further, however, and conflate stare decisis with the rule of law. To be sure, at times, adherence to precedent serves the ideals of the rule of law, but, as I discussed in part I A of this opinion, blindly following precedent can also result in a great cost on the rule of law. I can think of no case in which this reality has been more readily apparent than in the present case. In her dissenting opinion in *Santiago*, Chief Justice

Rogers stated: "[B]ecause there is no legitimate legal basis for finding the death penalty unconstitutional under either the federal or the state constitution, I can only conclude that the majority has improperly decided that the death penalty must be struck down because it *offends the majority's subjective sense of morality*." (Emphasis added.) *State* v. *Santiago*, supra, 318 Conn. 276–77 (*Rogers, C. J.*, dissenting). Then, in dissent to this court's denial of the state's motion for argument, which the state had filed after we issued our decision in *Santiago*, she wrote: "By denying the state's motion for argument and reconsideration, the majority merely reconfirms my belief that it has *not* engaged in an objective assessment of the constitutionality of the death penalty under our state constitution." (Emphasis added.) *State* v. *Santiago*, supra, 319 Conn. 920 (*Rogers, C. J.*, dissenting). In light of Chief Justice Rogers' belief that the majority opinion in *Santiago* was driven by the individual predilections of the justices who had joined that opinion, her contention in the present case that the rule of law binds her to that decision, as Justice Scalia might say, "taxes the credulity of the credulous." *Maryland* v. *King*, U.S. , 133 S. Ct. 1958, 1980, 186 L. Ed. 2d 1 (2013) (Scalia, J., dissenting). Out of a so called "respect for the rule of law," Chief Justice Rogers shows that ideal the greatest disrespect by entrenching, *into our constitutional jurisprudence no less*, what she perceives to be the rule of individuals.

In addition, if this court's legitimacy is truly a matter of "*substance and* perception"; (emphasis added) *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 505 U.S. 865; then, certainly, we must acknowledge and correct plain error. Id., 983 (Scalia, J., concurring in the judgment in part and dissenting in part). Insofar as it is perception that Chief Justice Rogers and Justice Robinson are worried about, the answer is simple. To prevent the appearance that we are a court driven by the whim of a majority of the justices, we must carefully obey the rule of law. We do so by applying an objective and transparent standard to weigh the benefit and costs of giving *Santiago* stare decisis effect. Applying objective standards in a neutral way, and then articulating the reasons for our holding, will placate any appearance that this court is governed by people rather than by laws. After all, the rule of law, at its essence, is governmental decision-making within a framework of *laws*. As Professor Daniel A. Farber so aptly put it in a slightly different context, it is understandable for justices to be troubled by the perception that they are acting, not on the basis of their interpretation of the law but, rather, on the basis of the personal proclivities of a majority of the justices. See D. Farber, "The Rule of Law and the Law of Precedents," 90 Minn. L. Rev. 1173, 1197 (2006). "The proper response, however, is for those [j]ustices to consider the merits of the case with particular care, to guard against any

unconscious influences from political pressures [or personal belief] one way or the other, and then to explain their reasoning with clarity to the public." Id. As I have already discussed, the careful application of an objective stare decisis standard clearly dictates that this court should not uphold *Santiago* on the basis of stare decisis. To do otherwise would disserve, and not enhance, the integrity of this court.

I now turn to the second premise of Chief Justice Rogers' and Justice Robinson's contentions, namely, that the change in this court's membership between *Santiago* and the present case *is the reason* we would overturn *Santiago*.[26] Their reasoning suffers from the logical fallacy of post hoc ergo propter hoc, or "after this, therefore resulting from it." Black's Law Dictionary, supra, p. 1355; see also id. (defining "post hoc ergo propter hoc" as "[t]he logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential"). Their reasoning is simple. Because the present appeal has been decided after a change in the court's membership, the change in the membership is the reason to overturn *Santiago*. The flaw in this argument should be evident. If this court now were to overturn *Santiago*, it would not be because Justice Robinson replaced Justice Norcott. Certainly, the change in court membership may be a circumstance under which the overruling occurs, but it is nothing more than pure happenstance. Instead, the actual reasons for overruling *Santiago*, as I have already stated, would be, one, a majority of the justices believes that decision is not supported by the law and, two, after weighing the benefit and costs of stare decisis, a majority of the justices concludes that *Santiago* is not deserving of stare decisis effect.[27]

Even more troubling than the fallaciousness of this argument is its suggestion that this court is bound, now and forever, to follow any decision, right or wrong, unless the panel that decided the previous case is identical to the panel that wishes to overrule that case. Such a rule would completely ignore the past practice of this court. In fact, I have yet to uncover, despite considerable research, a case in which a panel overruling a previous decision of this court was identical to the panel that decided the case being overruled. This has held true even when we have overruled a decision only shortly after it was released. For example, in *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), we overruled a conclusion we reached seven weeks earlier in *State* v. *Sanseverino*, 287 Conn. 608, 625–26, 641, 949 A.2d 1156 (2008), superseded in part, 291 Conn. 574, 969 A.2d 710 (2009). Despite the passage of such little time, the panels in both cases were not identical. *Sanseverino* was decided by Chief Justice Rogers and Justices Norcott, Katz, Palmer, and me. See *State* v. *Sanseverino*, supra, 287 Conn. 608. Justices Vertefeuille and Sullivan, however, were also members of the panel

in *DeJesus*. See *State* v. *DeJesus*, supra, 418. Perhaps some might argue that the panel change did not impact our decision to overrule *Sanseverino*, but that fact is of no legal significance. It has likewise been observed that many overruling decisions in the United States Supreme Court were issued after a change in court membership.[28]

In response, I imagine that Chief Justice Rogers and Justice Robinson would echo the arguments made by one of our colleagues at oral argument in the present case. At oral argument, it was suggested that some change in circumstances or law, other than a change in court personnel, is necessary to justify overruling a prior decision. Perhaps they would justify this court's previous departures from precedent, despite the changes in court composition, by explaining that "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." (Internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 318, 736 A.2d 889 (1999). And, of course, this justification would undoubtedly explain some of our past overruling decisions. It does not, however, explain why we should be restrained from overruling a case that was demonstrably wrong when decided, has not engendered any reliance, and imposes significant costs on society simply because a justice who decided it has been replaced. In fact, the United States Supreme Court required nothing more when it overruled *Bowers* v. *Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), in *Lawrence* v. *Texas*, 539 U.S. 558, 577–78, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003). See *Lawrence* v. *Texas*, supra, 577, 578 (noting that "*Bowers* was not correct when it was decided," that it was not correct when court overruled it, and that "[t]he holding in *Bowers* . . . ha[d] not induced detrimental reliance"). It is worth noting that the court that decided *Lawrence* was almost entirely different from the court that decided *Bowers*. Only Chief Justice Rehnquist and Justices O'Connor and Stevens sat on both cases. Compare id., 561, with *Bowers* v. *Hardwick*, supra, 187. Moreover, in *DeJesus*, this court did not rely on any arguments or experience that was not presented by the dissenting justice in *Sanseverino*. See *State* v. *DeJesus*, supra, 288 Conn. 529 (*Katz, J.*, dissenting); see also *State* v. *Sanseverino*, supra, 287 Conn. 641–42 (*Zarella, J.*, dissenting). Instead, the majority in *DeJesus* merely concluded that *Sanseverino* was wrong. See *State* v. *DeJesus*, supra, 437. If a change in court membership could prevent a subsequent court from considering a previous court's decision, "segregation would be legal, minimum wage laws would be unconstitutional, and the [g]overnment could wiretap ordinary criminal suspects without first obtaining warrants." *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 377 (Roberts, C. J., concurring). Surely, such a rule is not sound policy.

Perhaps realizing the illogicality of a rule that would prohibit this court from overruling an erroneous decision simply because a member of the majority that reached such decision has left the court, Chief Justice Rogers suggests that we employ an even more unreasonable test. See footnote 2 of Chief Justice Rogers' concurring opinion. She acknowledges that a manifestly incorrect decision that has engendered no reliance may be overturned. See id. In determining whether a prior decision is manifestly incorrect, however, she is guided not by what a majority of the current justices thinks but by what the majority of the justices in the prior decision thinks, or might think if they still occupied a seat on our bench.[29] See id. Thus, the salient question in the present appeal becomes: "What would Justice Norcott do?" And the current court is required to divine an answer. Surely, the reader does not need me to call his or her attention to the theoretical flaw in this idea. Under such a test, our decisions will turn on pure speculation regarding how a former justice, or justices, would decide a current case if they were still on the court. In addition, justices who have reached the constitutionally required retirement age, and in some cases, who have passed away, will continue to rule supreme in this institution, not because of the decisions they wrote, and the reasoning therein, but simply because they happened to vote with the majority in a case that is subsequently under reconsideration.

Normally, I accept what my colleagues have written and do not attempt to uncover a delitescent meaning or ulterior motive, and I will not do so in the present case. I have trouble accepting, however, that it is the institutional integrity of this court that truly concerns Chief Justice Rogers. First, she largely agrees with the stare decisis analysis I have presented in this opinion. See footnote 2 of Chief Justice Rogers' concurring opinion. Second, she does not refute my argument that this court's legitimacy comes from a fidelity to the rule of law; overruling prior cases is, in many instances, consistent with the rule of law, and any appearance that we are driven by the rule of individuals can be placated by the application of an objective stare decisis test. Third, in the recent past, neither this court nor Chief Justice Rogers has expressed concern about overruling a prior decision after a change in court membership.[30]

Chief Justice Rogers also expresses concern that overruling *Santiago* would send the message that a challenge to any four to three decision may be mounted when a member of the original majority leaves the court. My response is concise and simple: So what. This has been, and will always be, the case, unless we make stare decisis an inexorable command. A challenge may, at any time, be mounted against any of our previous decisions, whether they are four to three, five to two, six to one, or unanimous. That is part of our constitutional

system. For a period of more than thirty years, criminal defendants repeatedly and consistently attacked this court's interpretation of the state's kidnapping statutes. See, e.g., *State* v. *Luurtsema*, 262 Conn. 179, 200, 202, 811 A.2d 223 (2002); *State* v. *Amarillo*, 198 Conn. 285, 304–306, 503 A.2d 146 (1986); *State* v. *Chetcuti*, supra, 173 Conn. 170–71. In *State* v. *Salamon*, supra, 287 Conn. 513–14, this court decided to adopt the interpretation the criminal defendants had been advocating for years. Moreover, the majority in *Salamon* did not seem troubled at all by the fact that various earlier compositions of this court had repeatedly rejected such an interpretation. This court need not stand blindly by an earlier decision simply because it was reached on the narrowest of votes.[31] Instead, what is important is that the court objectively apply the legal rules that govern each case and decide, on the basis of a neutral application of a principled stare decisis doctrine, whether the dictates of stare decisis require us to continue to adhere to an earlier, erroneous decision.

In sum, the argument that the integrity and legitimacy of this court would be undermined by overruling *Santiago* is faulty. First, the rule of law does not bind us to erroneous precedent. Instead, it requires us to neutrally apply an objective stare decisis framework and to decide whether the benefit of affording *Santiago* stare decisis effect is outweighed by the costs. Second, if the entire court were to reexamine our holding in *Santiago*, and, after such examination, a majority of the justices were to conclude that *Santiago* is wrong, it would *not* be because there has been a change in the court's membership.

### III

### CONCLUSION

In closing, I want to note an astute observation once made by Chief Justice Charles Evan Hughes, when he was an Associate Justice of the United States Supreme Court. In response to the argument that dissent weakens the court's institutional prestige, Justice Hughes wrote: "When unanimity can be obtained without sacrifice of conviction, it strongly commends the decision to public confidence. But unanimity [that] is merely formal, [that] is recorded at the expense of strong, conflicting views, is not desirable in a court of last resort, whatever may be the effect [on] public opinion at the time. This is so because what must ultimately sustain the court in public confidence is the character and independence of the judges. They are not there simply to decide cases, but to decide them as they think they should be decided, and while it may be regrettable that they cannot always agree, it is better that their independence should be maintained and recognized than that unanimity should be secured through its sacrifice." C. Hughes, The Supreme Court of the United States: Its Foundation, Methods and Achievements—An Interpre-

ation (1928) pp. 67–68. The observation of Justice Hughes is equally applicable in the present case. What will ultimately sustain this court's legitimacy is a prudent and independent exercise of the judgment of each individual justice, guided, of course, by our constitution and our laws. Just as it may be regrettable when the justices do not all agree, it may also be regrettable that our public appearance may temporarily be tarnished when we overrule a previous decision in short order. Far greater, and more important, than such regret, however, is our oath to uphold the constitution and our duty to objectively interpret that law. I am troubled by the suggestion that we must adhere to a decision, despite our belief that such a decision is unconstitutional, for no reason other than the appearance that we have changed our mind due to a change in court personnel. I cannot, in good conscience, join the court in such action. I believe the oath we take requires more of us.

[1] It would be careless of me if I failed to mention that stare decisis has never been prominent in our capital punishment jurisprudence. Indeed, past justices convinced of the death penalty's unconstitutional status were unmoved by the doctrine of stare decisis and continually declined to join the court's decisions upholding capital punishment. For example, dissenting in part from the majority opinion in *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), Justice Berdon concluded that capital punishment was facially unconstitutional under our state constitution because it did not comport with the contemporary standards of decency. Id., 286–87, 319, 334 (*Berdon*, *J.*, dissenting in part). Despite this court's contrary holding in that case; id., 256; Justice Berdon continued to dissent in capital cases, arguing that the death penalty was per se unconstitutional. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 523, 743 A.2d 1 (1999) (*Berdon*, *J.*, dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 551, 680 A.2d 147 (1996) (*Berdon*, *J.*, dissenting); *State* v. *Breton*, 235 Conn. 206, 260, 663 A.2d 1026 (1995) (*Berdon*, *J.*, dissenting). Similarly, the first time Justices Norcott and Katz decided a capital punishment case, they, too, felt unconstrained by precedent, such as *Ross*. In *Webb*, Justice Katz joined Justice Berdon's dissent, concluding that the death penalty was facially unconstitutional; *State* v. *Webb*, supra, 551; and Justice Norcott concluded, in dissent, that the Connecticut capital penalty scheme violated the state constitution's prohibition against cruel and unusual punishment, although he would not say that the death penalty was unconstitutional in all cases. See id., 566–67 (*Norcott*, *J.*, dissenting). Subsequently, in *Cobb*, Justice Norcott joined Justices Berdon and Katz in their belief that the death penalty was unconstitutional in all cases. See *State* v. *Cobb*, supra, 543 (*Norcott*, *J.*, dissenting); see also id., 522–23 n.1 (*Berdon*, *J.*, dissenting). Both Justices Norcott and Katz maintained their position throughout their tenure on this court; see, e.g., *State* v. *Santiago*, 305 Conn. 101, 307 n.166, 49 A.3d 566 (2012) (Justice Norcott, writing for the majority, declined to examine constitutional challenge to capital punishment because it had been recently rejected by majority of this court in *State* v. *Rizzo*, 303 Conn. 71, 184, 201, 31 A.3d 1094 [2011], cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 [2012], but he maintained that he remained steadfast in his own conclusion that death penalty does not comport with Connecticut constitution), superseded in part by *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015); *State* v. *Rizzo*, supra, 202 (*Norcott*, *J.*, dissenting) ("I continue to maintain my position that the death penalty has no place in the jurisprudence of the state of Connecticut" [internal quotation marks omitted]); *State* v. *Colon*, 272 Conn. 106, 395, 864 A.2d 666 (2004) (*Norcott*, *J.*, concurring) (Justice Norcott indicated that he continued to adhere to his " 'ongoing position' " that death penalty is unconstitutional but joined majority because judgment of court did not result directly in imposition of death, as court reversed defendant's death sentence), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Colon*, supra, 395 (*Katz*, *J.*, concurring and dissenting) ("I maintain my belief that the death penalty fails to comport

with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment" but "concur . . . because . . . I have an obligation to decide the issue before the court" [internal quotation marks omitted]); *State* v. *Peeler*, 271 Conn. 338, 464, 857 A.2d 808 (2004) (*Katz, J.*, with whom *Norcott, J.*, joins, dissenting) ("[a]dhering to . . . view that the death penalty is, in all circumstances, cruel and unusual punishment prohibited by the constitution"), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Rizzo*, 266 Conn. 171, 313–14, 833 A.2d 363 (2003) (*Norcott, J.*, concurring) (noting continued belief that death penalty cannot " 'be administered in accordance with the principles of fundamental fairness set forth in our state's constitution' " but joining majority because decision related to procedural safeguards in imposing ultimate punishment and did not directly result in imposition of death sentence); *State* v. *Rizzo*, supra, 266 Conn. 314 (*Katz, J.*, concurring and dissenting) ("I maintain my belief that the death penalty . . . violates our state constitution's prohibition against cruel and unusual punishment. . . . Nevertheless, I address the issue pertaining to the burden of persuasion for the imposition of the death penalty because . . . I have an obligation . . . to decide the issue before the court . . . ." [Citation omitted; internal quotation marks omitted.]); *State* v. *Reynolds*, 264 Conn. 1, 254, 836 A.2d 224 (2003) (*Katz, J.*, dissenting) (maintaining belief that death penalty violates state constitution's prohibition against cruel and unusual punishment), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Courchesne*, 262 Conn. 537, 583–84, 816 A.2d 562 (2003) (*Norcott, J.*, concurring) (maintaining opposition to constitutionality of death penalty but joining majority because it addressed narrow procedural question and because imposition of death penalty would not necessarily follow as direct consequence of majority's decision); *State* v. *Courchesne*, supra, 584–85 (*Katz, J.*, concurring and dissenting) (same); *State* v. *Webb*, 252 Conn. 128, 147, 750 A.2d 448 (*Norcott, J.*, dissenting) (expressing continued opposition to death penalty), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); *State* v. *Webb*, supra, 252 Conn. 147 (*Katz, J.*, dissenting) ("I continue to believe that the death penalty . . . violates our state constitution's prohibition against cruel and unusual punishment"); despite this court's numerous decisions to the contrary. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 201 ("[w]e conclude that the death penalty, as a general matter, does not violate the state constitution"); *State* v. *Colon*, supra, 383 (rejecting invitation to reconsider decisions holding death penalty constitutional because court was not convinced that previous decisions were wrong); *State* v. *Reynolds*, supra, 236–37 (same); *State* v. *Webb*, supra, 238 Conn. 401 (disagreeing with defendant's claim that "the death penalty statutes facially violate . . . article first, §§ 8 and 9, of the Connecticut constitution"); *State* v. *Ross*, supra, 251 (rejecting claim that death penalty is cruel and unusual in all circumstances).

In my view, it is appropriate for our capital punishment jurisprudence to take little notice of stare decisis. The stakes in capital cases are high—life or death—and it is unlikely that any justice of this court will be unsure of the constitutional status of the ultimate punishment, whether he or she believes that it is constitutional or unconstitutional. It seems that the best decision-making policy in this arena, in which our holdings are of great constitutional, moral, and practical magnitude, is to allow each justice to reach an independent judgment regarding the death penalty's constitutionality, while giving little weight to stare decisis. In the present case, however, the concurring justices heavily weigh stare decisis and thereby prevent each justice from reaching an independent judgment regarding the constitutionality of the death penalty.

[2] See also *State* v. *Santiago*, supra, 318 Conn. 277–78 (*Rogers, C. J.*, dissenting) ("The majority's decision to strike down the death penalty in its entirety is a judicial invalidation, without constitutional basis, of the political will of the people. It is this usurpation of the legislative power—not the death penalty—that violates the societal mores of this state as expressed in its fundamental law."); id., 341 (*Rogers, C. J.*, dissenting) ("the majority has addressed issues that the defendant did not raise, has relied on extra-record materials that the parties have not had an opportunity to review or to rebut, has failed to provide the state with an opportunity to respond to its arguments and conclusions and, finally, in reaching the decision that it has today, has unconstitutionally usurped the role of the legislature").

[3] This inconsistent application is best illustrated by a juxtaposition of cases in which this court overruled precedent with cases in which this court has upheld precedent. In many instances in which this court decides to overrule a previous case, it is not due to the clarity of the error in the

previous case or because the most cogent reasons and inescapable logic required it. Instead, it is simply because a majority of the members of the panel reaches a different conclusion than the majority of the previous panel. See, e.g., *Campos* v. *Coleman*, 319 Conn. 36, 43, 123 A.3d 854 (2015) (overruling *Mendillo* v. *Board of Education*, 246 Conn. 456, 717 A.2d 1177 [1998], in recognizing new cause of action after reconsidering five policy factors court addressed in *Mendillo* and simply reaching different conclusion regarding weight and balance of those factors, and stating that it "now agree[s] with the concurring and dissenting opinion in *Mendillo* that the public policy factors favoring recognition of [the] cause of action . . . outweigh those factors disfavoring recognition"); *State* v. *Salamon*, 287 Conn. 509, 542, 949 A.2d 1092 (2008) (overruling more than thirty years of precedent interpreting Connecticut's kidnapping statutes, which had not required proof that defendant had restrained victim for longer period or to greater degree than necessary to commit other charged crimes without explaining why, or even if, that prior precedent was clearly wrong); *Craig* v. *Driscoll*, 262 Conn. 312, 328–30, 340, 813 A.2d 1003 (2003) (implicitly overruling more than one century of case law denying common-law negligence action against purveyor of alcoholic beverages for injuries caused by intoxicated patron without so much as stating that case law was wrong, justifying new cause of action on basis that it would further objectives of state's Dram Shop Act, which was enacted with knowledge that no common-law negligence action would lie for such injuries, and overruling *Quinnett* v. *Newman*, 213 Conn. 343, 568 A.2d 786 [1990], which concluded that legislature had occupied field when it enacted Dram Shop Act, but noting that such conclusion was inconsistent with court's holding to contrary in *Kowal* v. *Hofher*, 181 Conn. 355, 436 A.2d 1 [1980]). Contrarily, in instances in which we uphold precedent, we trumpet the clearly wrong and most cogent reasons and inescapable logic standards. See, e.g., *State* v. *Ray*, 290 Conn. 602, 614–16, 966 A.2d 148 (2009) (denying defendant's invitation to overrule prior cases concluding that, under General Statutes § 21a-278 [b], defendant must prove that he or she is drug dependent, noting that, "[i]f [it had been] writing on a blank slate, [it] might [have found] persuasive the defendant's argument[s]," and noting that defendant's arguments were supported by statute's text, chronology of statutes, and legislative history but were raised and rejected in *State* v. *Hart*, 221 Conn. 595, 605 A.2d 1366 [1992], and defendant had presented "no developments in the law, no potential for unconscionable results, no irreconcilable conflicts and no difficulties in applying [the court's] construction of § 21a-278 [b]" and therefore had not demonstrated that previous cases were clearly wrong or that most cogent reasons and inescapable logic required overruling of them). To further illustrate our inconsistent application of this doctrine, I point the reader to the countless cases in which we overrule precedent without even a mere mention of stare decisis. In fact, my research has uncovered at least twenty-six such cases since I have joined this court. See, e.g., *Grey* v. *Stamford Health System, Inc.*, 282 Conn. 745, 757, 924 A.2d 831 (2007); *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 289, 914 A.2d 996 (2007); *Kerrigan* v. *Commissioner of Public Health*, 279 Conn. 447, 455, 904 A.2d 137 (2006); *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 691, 899 A.2d 586 (2006); *Right* v. *Breen*, 277 Conn. 364, 377, 890 A.2d 1287 (2006); *Alexson* v. *Foss*, 276 Conn. 599, 608 n.8, 887 A.2d 872 (2006); *State* v. *Singleton*, 274 Conn. 426, 438, 876 A.2d 1 (2005); *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004); *State* v. *Crawford*, 257 Conn. 769, 779–80, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002); see also footnote 30 of this opinion (citing cases spanning from 2007 to 2016). In highlighting the cases cited in this footnote and footnote 30 of this opinion, I do not mean to suggest that any of the overrulings were improper. I express no opinion in that regard. Instead, I use these cases simply to illustrate the point that our jurisprudence in this area is weak and inconsistent.

[4] I note that a plurality of justices, Justices Palmer, Eveleigh, and McDonald, need not resort to stare decisis because they continue to believe that *Santiago* is correct. Thus, any discussion of stare decisis as a rationale for affirming *Santiago* is unnecessary. Nonetheless, those justices do address stare decisis.

[5] The United States Supreme Court has suffered such criticism at the hands of numerous academic writers precisely because it has inconsistently applied its stare decisis doctrine. See, e.g., C. Cooper, "Stare Decisis: Precedent and Principle in Constitutional Adjudication," 73 Cornell L. Rev. 401, 402 (1988) (characterizing stare decisis as "a doctrine of convenience, to

both conservatives and liberals" and stating that "[i]ts friends, for the most part, are determined by the needs of the moment"); M. Paulsen, "Does the Supreme Court's Current Doctrine of Stare Decisis Require Adherence to the Supreme Court's Current Doctrine of Stare Decisis?," 86 N.C. L. Rev. 1165, 1209 (2008) ("Notions of 'judicial integrity' would seem to require acknowledgment that stare decisis is a doctrine of convenience, endlessly pliable, followed only when desired, and almost always invoked as a make-weight. . . . [I]t [is] a 'Grand Hoax.'").

[6] In the process of articulating an objective stare decisis framework, it will be necessary to overrule, at least in part, our current stare decisis jurisprudence. That irony is not lost on me. This overruling, however, is justified under the analysis I set forth subsequently in this opinion. Briefly, there is no doubt that our stare decisis doctrine has been relied on by individuals and the branches of government. See part I A 1 of this opinion (addressing reliance interests in stare decisis). In fact, each time an individual or government agency, including a court, relies on a decision of this court, it is implicitly relying on stare decisis and the belief that we will not overrule such a decision. Those interests, however, are outweighed by the costs of adhering to our current jurisprudence on this point. First, and most important, our current doctrine is unworkable and unpredictable. See footnotes 3 and 30 of this opinion; see also part I A 2 c of this opinion (explaining cost of unworkability and uncertainty). Second, it is likely that only this court can bring order to the chaos in our stare decisis jurisprudence. See part I A 2 a of this opinion (discussing cost of error correction). Because the doctrine is, in essence, a principle of judicial decision-making, it seems unlikely that the General Assembly could legislate on the matter.

[7] I acknowledge that this court's past practice may not have required that we first decide whether the previous decision was correct. As I will explain in this part of my opinion, however, deciding the merits question as a threshold matter, and keeping such determination independent of the stare decisis analysis, provides a more objective, and therefore principled, approach to stare decisis.

[8] I recognize that, previously in this opinion, I criticized Chief Justice Rogers for overlooking the clearly wrong exception to our stare decisis jurisprudence. I did so, however, to point out this court's inconsistent application of stare decisis, not to suggest that a previous decision's wrongness should continue to be part of this court's stare decisis calculus.

[9] I acknowledge that Justice Robinson does not agree that the merits and stare decisis analyses are distinct and separate. Instead, he considers the degree of a precedent's wrongness to be a component in deciding whether a prior decision should be given stare decisis effect. He gives two reasons why he cannot agree with a stare decisis framework, such as the one presented in this opinion, that does not consider a precedent's relative degrees of wrongness. I will address each of these concerns in turn but first note that this court's decisions are either right or wrong. To what degree a decision is wrong does not, in the end, change the fact that it is wrong. This point is particularly important in constitutional adjudication, such as in the present case. Our constitution is the supreme law of this state, and all judges have sworn an oath to uphold it. If a case purporting to expound on the constitution is wrong as to its meaning or application, that case is in conflict with the constitution, and the mere fact that the case might be only slightly wrong, whatever that might mean, does not save it. This is why the degree to which a precedent is wrong is irrelevant to the stare decisis calculus.

With respect to Justice Robinson's concerns, he first states that the stare decisis analysis set forth in this opinion "appears to be receptive to overruling precedent in a way that undercuts the salutary features with respect to promoting stability in the law." Footnote 5 of Justice Robinson's concurring opinion. This point highlights a theoretical difference in our views. Justice Robinson, it appears, believes that stability in the law, in and of itself, has some normative value worthy of protection. Thus, if a prior decision of this court is only slightly wrong, he might sustain it for the sake of preserving stability. In my view, however, stability has no normative value independent of the protection of actual reliance interests, as I explain in part I A 1 of this opinion, and, therefore, it is the degree of reliance, not wrongness, that I consider to be important in a stare decisis analysis. See, e.g., *State* v. *Salamon*, supra, 287 Conn. 520 (noting that adherence to precedent and, thereby, in my view, stability, "is not an end in and of itself" [internal quotation marks omitted]). Insofar as Justice Robinson might be suggesting that stability in our case law is important because it engenders public reliance

on our decisions, I submit that such an interest is equally protected by a stare decisis analysis focused on assessing the reliance a decision has garnered.

Second, Justice Robinson argues that my approach "overrule[s] certain well established principles of stare decisis, namely, that: (1) the prior decision must be shown to be '*clearly wrong*' with a 'clear showing that an established rule is incorrect and harmful' . . . and (2) 'a court should not overrule its earlier decisions unless the *most cogent* reasons and *inescapable logic* require it.' " (Citation omitted; emphasis in original.) Footnote 5 of Justice Robinson's concurring opinion. I have acknowledged this irony and have explained why our stare decisis jurisprudence should be overruled. See footnote 6 of this opinion.

[10] This natural tension is less apparent and problematic when this court considers stare decisis in the context of the common law, because the source of the common law is precedent, and not a written constitution or code. Moreover, the common law has developed incrementally and over time.

[11] Chief Justice Rogers and Justice Robinson both claim that maintenance of the court's legitimacy is also a benefit of stare decisis. Perhaps at a superficial level they are correct, but, upon deeper reflection, it becomes clear that the court's legitimacy comes from fidelity to the rule of law. See part II of this opinion. At times, the rule of law will counsel us to follow precedent, and, in such cases, adherence to the dictates of stare decisis does contribute to the court's institutional legitimacy. Other times, however, fidelity to the rule of law will require us to depart from erroneous judicial decisions. In such cases, after fair and careful consideration and impartial application of the applicable law, this court's legitimacy is not harmed simply because it has decided to depart from a previous erroneous ruling. Thus, for these reasons, I do not believe that this court's legitimacy is an appropriate factor to be considered in the stare decisis calculus. Moreover, if Chief Justice Rogers and Justice Robinson were right, we could rarely, if ever, overrule precedent. See part II of this opinion.

In the past, we have also cited the conservation of resources and judicial efficiency as justifications for stare decisis. See, e.g., *Conway* v. *Wilton*, supra, 238 Conn. 659. It seems to me that these benefits, however, are reasons to adhere to precedent in general and not justifications for the continued adherence to wrong decisions specifically. In the words of then Judge, later Justice, Benjamin N. Cardozo, "the labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." B. Cardozo, The Nature of the Judicial Process (1921) p. 149. Thus, following precedent conserves resources and fosters efficiency because it prevents the court from having to consider every possible issue, in every case. For example, if a criminal defendant claims that he has been tried and convicted in violation of the state constitution's prohibition against double jeopardy, he need not first argue that the due process clause of article first, § 8, of the state constitution prohibits double jeopardy. Instead, he may rely on our cases holding to that effect. See, e.g., *State* v. *Gonzalez*, 302 Conn. 287, 314–15, 25 A.3d 648 (2011). Thus, adherence to precedent creates efficiency and conserves resources by allowing litigants to rely and build on our past decisions in order to frame their arguments and focus our attention on the unique issues that arise in their case, rather than having to start from ground zero. When we decide to reexamine a previous decision, however, as we have in the present case, little efficiency results from adherence to stare decisis after briefs are filed and arguments are heard.

[12] *Salamon* and *Conway* are but two examples in which this court has decided to revisit and overrule its prior decisions because the discarded cases had not conjured any meaningful reliance. Other examples abound. See, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 647, 655, 95 A.3d 1011 (2014) (in limiting rule in *Gurliacci* v. *Mayer*, 218 Conn. 531, 590 A.2d 914 [1991], Chief Justice Rogers reasoned "that allowing a plaintiff to maintain a loss of consortium claim under . . . circumstances [in which she was not married to the injured person because such marriage was prohibited by law would] not impair preexisting expectations or reliance interests in any serious way"); *State* v. *DeJesus*, 288 Conn. 418, 479 n.2, 953 A.2d 45 (2008) (*Palmer, J.*, concurring) (reasoning that lack of "any material reliance" on previous decision gives stare decisis little force); *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 681, 855 A.2d 212 (2004) (overruling *Morel* v. *Commissioner of Public Health*, 262 Conn. 222, 811 A.2d 1256 [2002], and *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 782 A.2d 670 [2001], in part because

neither case is type that engenders significant reliance interest); *Craig* v. *Driscoll*, 262 Conn. 312, 349–50, 813 A.2d 1003 (2003) (*Sullivan, C. J.*, dissenting) (stare decisis dictated that court not create common-law negligence action against purveyor of alcohol because legislature, in enacting Dram Shop Act, relied on long established common law rejecting such claim); *Ozyck* v. *D'Atri*, 206 Conn. 473, 484, 538 A.2d 697 (1988) (*Healey, J.*, concurring) (noting reason "stare decisis applies with special force to decisions affecting titles to land is the special reliance that such decisions mandate"); *O'Connor* v. *O'Connor*, supra, 201 Conn. 645 ("[o]ur refusal to adhere to . . . [prior precedent] . . . does not defeat any legitimate prelitigation expectations of the parties founded in reliance on our prior decisions").

[13] Commercial actors provide an informative example. Such actors routinely rely on judicial decisions when forming contracts or structuring corporate organizations. See, e.g., *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 365, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (reliance interests are important considerations in contract cases because parties act in conformance with existing legal rules when structuring transactions); *Quill Corp.* v. *North Dakota ex rel. Heitkamp*, 504 U.S. 298, 317, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992) (declining to overrule previous rule because it "has engendered substantial reliance and has become part of the basic framework of a sizable industry"). If the law was in constant flux, however, commercial actors would be unable to rely on it, resulting in either a chilling of commercial activities or frequent upsetting of expectations, thereby causing a waste of resources.

[14] Chief Justice Sullivan's legislative reliance argument was vindicated approximately four months after our decision in *Craig* when the legislature passed No. 03-91 of the 2003 Public Acts (P.A. 03-91), abrogating our holding in *Craig*, at least with respect to intoxicated patrons who are twenty-one years of age or older. See P.A. 03-91, § 1, codified at General Statutes (Rev. to 2005) § 30-102.

[15] The Connecticut constitution may be amended in one of two ways. First, any legislator may propose an amendment. See Conn. Const., amend. VI. The proposed amendment must be approved either by three fourths of the members of each house of the General Assembly or by at least a majority of the members of each house in two successive sessions of the General Assembly. Conn. Const., amend. VI. Once so adopted, the amendment is presented to the people for their approval at the next general election. Conn. Const., amend. VI. To become effective, it must receive the support of a majority of the electors voting on the amendment. Conn. Const., amend. VI.

Second, the constitution may be amended at a convention called for such purpose. See Conn. Const., art. XIII, § 1. A constitutional convention can be called by either the General Assembly or the people. See Conn. Const., art. XIII, §§ 1 and 2. The General Assembly may convene a constitutional convention by a two-thirds vote of the members of each house. Conn. Const., art. XIII, § 1. A convention can be convened in this way at any time not earlier than ten years since the convening of a prior convention. Conn. Const., art. XIII, § 1. Alternatively, every twenty years, the people are presented, at a general election, with the question of whether a constitutional convention shall be convened. See Conn. Const., art. XIII, § 2. If a majority of the electors voting on such question call for a convention, a convention will be convened. See Conn. Const., art. XIII, § 2. Any proposals from a constitutional convention to amend the constitution will become effective when approved by a majority of the people voting thereon. See Conn. Const., art. XIII, § 4.

As is evident from the foregoing discussion, amending the Connecticut constitution is no easy task. It requires supermajoritarian or successive majoritarian action by the General Assembly, accompanied by approval of a majority of the state's citizens. If the General Assembly does not propose constitutional amendments or call a constitutional convention for that purpose, the citizens have the opportunity to call such a convention and to propose amendments only once every twenty years.

[16] I acknowledge that not all scholars and historians believe that Reverend Hooker's sermon was political in nature or that it inspired the Fundamental Orders of 1639. See M. Besso, "Thomas Hooker and His May 1638 Sermon," 10 Early Am. Stud. 194, 197, 207 (2012). There have been many interpretations of Reverend Hooker's sermon. Some historians have suggested it pronounced and advocated new principles for government, which later appeared in the Fundamental Orders. See id., 202–206. Others have argued that Reverend Hooker's ideas were not original but representative of local practices, and that the sermon's ultimate goal was to advocate for a form of civil government. See id., 206–207. Still other historians suggest that Reverend

Hooker's sermon was not politically motivated at all but espoused a religious message. See id., 207. Whether Reverend Hooker's sermon was the catalyst for the Fundamental Orders, simply reflected popular understanding of government at the time, or was a religious message is unimportant for present purposes. What is important is that it embodied the spirit and beliefs of the time, and those beliefs embraced the principles of popular sovereignty.

[17] In 1662, the Fundamental Orders were supplanted by the Charter of 1662 granted by King Charles II, although the structure of government was left largely unchanged. See H. Cohn, supra, 64 Conn. B.J. 337–39. The Charter of 1662 remained in effect at least until the signing of the Declaration of Independence in 1776, except for a short, eighteen month period in the 1680s when Connecticut was annexed as part of the Dominion of New England. See id., 340–42; see also W. Horton, "Connecticut Constitutional History: 1776–1988," 64 Conn. B.J. 355, 357 (1990).

[18] In 1776, Connecticut, along with the other colonies, declared its independence from England. W. Horton, "Connecticut Constitutional History: 1776–1988," 64 Conn. B.J. 355, 357 (1990). Rather than abandoning the Charter of 1662 for a new constitution, however, the General Assembly simply removed any reference to the English monarch and declared that the government established by the Charter would remain the "civil constitution of this state . . . ." (Internal quotation marks omitted.) Id.

In the years after declaring independence from England and leading up to the constitutional convention of 1818, whether Connecticut had a constitution became a contentious issue. See R. Purcell, Connecticut in Transition: 1775–1818 (1918) pp. 177–80, 243–46, 249–50, 259–61. The arguments that the state had no constitution sounded in theories of popular sovereignty. See id., pp. 177–80, 243–46. For example, if the people were the fountain of power, which was the belief in Connecticut, the Charter of 1662, it was argued, could not be the state's constitution because it was adopted by the General Assembly, not the people. See id., 177–80. John Leland stated in 1802: "The people of Connecticut have never been asked, by those in authority, what form of government they would choose; nor in fact, whether they would have any form at all. For want of a specific constitution, the rulers run without bridle or bit, or anything to draw them up to the ring-bolt." (Internal quotation marks omitted.) Id., p. 245. Moreover, the General Assembly could amend or revoke any law it wanted, including those set forth in the Charter. Id., pp. 255–56.

Likewise, those who argued that there was a constitution in Connecticut also relied on popular sovereignty. Judge Zephaniah Swift wrote: "Indeed no form of government could have been valid, unless approved, and adopted by the people in convention, or in some other way." 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) p. 57. In fact, Judge Swift acknowledged that once Connecticut ratified the Declaration of Independence, thereby severing its ties with England, the people had the right to establish a new form of government, if they had seen fit. Id. Nonetheless, Judge Swift believed that the Charter of 1662 continued as the constitution of Connecticut. See id., pp. 56–57. He theorized that the real legitimacy of state government arose, not so much from the Charter, but from the people's assent to be governed as described by the Charter. See id., pp. 57–58. Even if the Charter was the sole basis of the government's power, Judge Swift argued, it still remained valid. See id., p. 58. Although the Charter, and the government it established, would have become invalid after Connecticut declared its independence from England, "the subsequent conduct of the people, in assenting to, approving of, and acquiescing in the acts of the legislature," established the validity of the Charter's continuation. Id.

Whether a constitution existed in Connecticut between 1776 and 1818 is unimportant for present purposes. What is important is that the debate on that issue illustrated the prominence of popular sovereignty in Connecticut in the years leading up to the 1818 constitutional convention. Moreover, this debate was the impetus, at least in part, for that convention.

[19] Examples of what I view as this court's overreach abound. See, e.g., *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 244–45, 990 A.2d 206 (2010); *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 544–45, 858 A.2d 709 (2004); *Sheff* v. *O'Neill*, 238 Conn. 1, 3–4, 678 A.2d 1267 (1996).

[20] *Lochner* v. *New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), provides an instructive example of intervention error. In that case, the United States Supreme Court struck down a state labor law; see id., 57–58, 64; holding, among other things, that the right of an employee and an employer to enter into an employment contract was protected by the due process

clause of the fourteenth amendment. Id., 53 ("[t]he right to purchase or to sell labor is part of the liberty protected by [the fourteenth] amendment [to the United States constitution], unless there are circumstances [that] exclude [that] right"). If, upon reconsideration, the United States Supreme Court had continued to adhere to the holding in *Lochner* and its progeny, the result would have been to immunize certain labor policies from majoritarian and legislative consideration. See *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 505 U.S. 861 (observing that overruling of *Adkins* v. *Children's Hospital*, 261 U.S. 525, 43 S. Ct. 394, 67 L. Ed. 785 [1923], by *West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379, 400, 57 S. Ct. 578, 81 L. Ed. 703 [1937], "signaled the demise of *Lochner*").

[21] In fact, Professor Lash argues that such cases should receive reverse stare decisis treatment, that is, the presumption should be for overruling, not sustaining, such cases. See K. Lash, supra, 93 Va. L. Rev. 1442, 1458, 1461. We need not go so far as to declare that such cases are presumptively invalid; it is sufficient to say that, in order to sustain such cases under the doctrine of stare decisis, the reliance interests to be protected must be extremely significant.

[22] See, e.g., *Montejo* v. *Louisiana*, 556 U.S. 778, 792, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009) ("the fact that a decision has proved unworkable is a traditional ground for overruling it" [internal quotation marks omitted]); *Lawrence* v. *Texas*, 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (noting that *Bowers* v. *Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 [1986], can be overruled because it creates uncertainty insofar as its central holding was inconsistent with other United States Supreme Court precedent); *Helvering* v. *Hallock*, 309 U.S. 106, 119, 60 S. Ct. 444, 84 L. Ed. 604 (1940) ("stare decisis is . . . not a mechanical formula of adherence to the latest decision . . . when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience").

[23] See Conn. Const., art. I, § 8 ("[n]o person shall be . . . deprived of *life*, liberty or property without due process of law" [emphasis added]); Conn. Const., amend. IV ("no person shall, for a *capital offense*, be tried by a jury of less than twelve jurors without his consent" [emphasis added]); Conn. Const., amend. XVII ("[i]n all criminal prosecutions, the accused shall have a right . . . to be released on bail upon sufficient security, except in *capital offenses*, where the proof is evident or the presumption great" [emphasis added]); Conn. Const., amend. XVII ("[n]o person shall be held to answer for any crime, *punishable by death* or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law" [emphasis added]).

[24] I note my belief that the textual references alone are sufficient to secure capital punishment's constitutional status. The events of the 1965 constitutional convention simply make me more resolute in my conclusion.

[25] Chief Justice Rogers misstates my stare decisis analysis when she asserts: "[D]istilled to its essence, [Justice Zarella's analysis asserts] that, if a past decision was manifestly incorrect and there has been no reliance on it, principles of stare decisis may not require the court to stand by that decision." Footnote 2 of Chief Justice Rogers' concurring opinion. As I have clearly stated, stare decisis does not require us to stand by a decision if "the costs of preserving judicial error outweigh any reliance interests . . . ." Part I A 2 c of this opinion. Although Chief Justice Rogers is partially correct insofar as stare decisis *does not* require a court to adhere to a manifestly incorrect decision that has engendered no reliance, her recitation of my test requires too much. Under my approach, stare decisis does not apply if the costs of adhering to an erroneous decision outweigh the reliance interests that would be upset by overruling that decision. Thus, if a case has not garnered any reliance, it could be overruled if adherence to such decision would impose the slightest of costs, regardless of whether it is *manifestly* wrong.

[26] It would be remiss of me not to note that the quandary regarding the change in court membership is entirely a problem of the court's creation. This court had the opportunity and idea to decide the present appeal before the appeal in *Santiago*, thereby allowing the full and current panel of the court to decide whether the prospective repeal of the death penalty set forth in P.A. 12-5 made it unconstitutional to carry out the death sentences then in place. In fact, the present appeal was originally argued on July 10, 2014, more than one year before *Santiago* was decided on August 25, 2015. Nevertheless, the court decided, despite our policy to have important constitutional issues decided by the full and current panel of this court, to answer

the novel question raised by the passage of P.A. 12-5 in *Santiago*, with a panel that included a justice who had long since reached the mandatory retirement age. Moreover, and as Justice Espinosa correctly notes in her dissenting opinion in the present case, the panel that decided an earlier appeal in *Santiago*; see *State* v. *Santiago*, 305 Conn. 101, 49 A.3d 566 (2012); in which the court did not reach the contention of the defendant, Eduardo Santiago, that the death penalty was per se unconstitutional, was different from the panel that decided Santiago's later appeal to this court in *State* v. *Santiago*, supra, 318 Conn. 1. I do not suggest it was improper for Justice Norcott to remain on the panel in *Santiago*. In fact, he was well within his right to do so under General Statutes § 51-198 (c). Instead, my concern is only over the order in which *Santiago* and the present appeal were decided.

[27] Justice Robinson suggests that I am overly optimistic about the public's ability to look past the panel change and to understand that the overruling of this court's recent decision in *Santiago* would not be because of the panel change but because, as I have just explained, a majority of the justices in the present case have concluded that (1) *Santiago* is wrong, and (2) the costs of adhering to *Santiago* greatly outweigh the benefit. See footnote 8 of Justice Robinson's concurring opinion. As a "cautionary tale," he refers to a recent decision of the Kansas Supreme Court, namely, *State* v. *Petersen-Beard*, Docket No. 108,061, 2016 WL 1612851 (Kan. April 22, 2016). Footnote 9 and accompanying text of Justice Robinson's concurring opinion. In that case, which was released April 22, 2016, the Kansas Supreme Court overruled three of its "prior" decisions, all also released April 22, 2016. *State* v. *Petersen-Beard*, supra, 2016 WL 1612851, *1. Arguments in the three prior decisions had been heard approximately one year before argument in *Petersen-Beard*, by a panel that contained a trial judge who was sitting by designation of the Chief Justice while a vacant seat on the court was filled. That seat was filled, and the new panel heard *Petersen-Beard*, reaching, as Justice Robinson notes, the opposite conclusion. Justice Robinson then notes that "the rapid overruling was . . . widely noticed, and primarily attributed to the change in personnel of the Kansas Supreme Court." Footnote 9 of Justice Robinson's concurring opinion. Justice Robinson does not refer to any evidence, however, that the public is outraged or has lost confidence in the court due to this overruling. Instead, he refers to a few legal scholars who observe the panel change and concurrent change in the court's position. See id. The brunt of the consternation noted by the scholars and the dissenting justices in *Petersen-Beard*, however, seems to be over the court's decision to delay the release of the three overruled cases for approximately eight months in order to draft the opinion in *Petersen-Beard*, which overruled those cases, thereby delaying the relief afforded the individual defendants and depriving similarly situated individuals of the benefit of the holding of the three overruled cases. In fact, the dissenting justices in *Petersen-Beard* do not even allude to stare decisis or the dangers of overruling a recent decision when the only change is in the composition of the panel. Thus, I respectfully disagree that *Petersen-Beard* illustrates why this court should refrain from overruling *Santiago*.

Finally, in response to a concern that Justice Palmer raises in his concurring opinion, I would like to note that *Petersen-Beard* provides an example of a court of last resort quickly reversing its own constitutional ruling.

[28] Professor Thomas R. Lee, in discussing factors that might explain the United States Supreme Court's tendency to overrule prior decisions, stated: "One statistical study has suggested, for example, that the [c]ourts that have disproportionately altered precedent have been characterized by significant changes in membership. . . . A familiar example is the Hughes Court, which overturned [fifteen] precedents during its last nine years after the [c]ourt's entire membership was transformed between 1937 and 1941. . . . Similarly, most of the Warren Court's decisions overruling precedent were handed down after Justice [Felix] Frankfurter's retirement in 1962, while most of the Burger Court's overruling decisions came after [Justice] Douglas' retirement in 1975." (Citations omitted.) T. Lee, supra, 52 Vand. L. Rev. 650 n.14.

[29] There is a great irony in Chief Justice Rogers' reasoning that gives me pause. While she is occupied with explaining that she, Justice Espinosa, and I have already espoused, "at great length," why we think *Santiago* is incorrect; footnote 2 of Chief Justice Rogers' concurring opinion; noting that Justices Palmer, Eveleigh, and McDonald continue to believe that *Santiago* was correctly decided, and speculating about how Justice Norcott would rule, she overlooks the elephant in the room: What does Justice Robinson, *a current member of this court sitting on this case*, think?

Of course, this is not the only problem that stems from Chief Justice

Rogers' reasoning, although it is the most important. She correctly notes the obvious, namely, that stare decisis does not require this court to stand by a manifestly incorrect decision that has not been relied on. See id. She then states: "In *Santiago*, however, [she], Justice Espinosa and I explained at great length why we believed that the majority decision was incorrect . . . and we were unable to persuade the majority." (Citations omitted.) Id. Isn't this a curious notion? Apparently, when determining whether a previous decision of this court was manifestly incorrect, we consider whether the dissenting justices in the prior case successfully persuaded the majority justices that they, the majority, had reached a manifestly incorrect decision. If the dissenting justices had prevailed in the prior decision, would the outcome not have been different? Obviously, it would have been, so Chief Justice Rogers must mean something else. Perhaps, what she is trying to suggest is that she, Justice Espinosa, and I must now come up with a *new* reason that *Santiago* is incorrect. Why, if *Santiago* was incorrect when decided for the reasons that we then stated, would it not still be incorrect for the same reasons today? After all, as Chief Justice Rogers has observed, it has been less than one year since we decided *Santiago*. Moreover, I am again back to that vexing question, what does Justice Robinson think? That seems like a particularly important question under the current circumstances when three of the current members of the court think *Santiago* is correct and three others have explained why it is demonstrably wrong. If Justice Robinson could offer a different explanation for why *Santiago* is erroneous, would that get us past Chief Justice Rogers' unique test?

Finally, Chief Justice Rogers notes that those justices who were in the majority in *Santiago*, and join in the per curiam opinion in the present case, continue to believe that *Santiago* is correct, almost as to suggest that, if only one of them had changed his mind, perhaps we would then be permitted to overrule *Santiago*. Again, she leaves the reader to create his or her own explanation. Unfortunately, I can be of no help. I cannot think of any constitutional, statutory, or common-law rule that bestows greater authority on a justice who was in the majority of a prior decision when that decision is being reconsidered.

[30] During Chief Justice Rogers' tenure on this court, we have overruled prior precedent in twenty-five cases. See *State* v. *Wright*, 320 Conn. 781, 810, A.3d (2016); *Arras* v. *Regional School District No. 14*, 319 Conn. 245, 268–69 n.24, 125 A.3d 172 (2015); *Campos* v. *Coleman*, supra, 319 Conn. 38, 57; *State* v. *Moreno-Hernandez*, 317 Conn. 292, 308, 118 A.3d 26 (2015); *Haynes* v. *Middletown*, 314 Conn. 303, 316, 323, 101 A.3d 249 (2014); *State* v. *Artis*, 314 Conn. 131, 156, 101 A.3d 915 (2014); *State* v. *Elson*, 311 Conn. 726, 754, 91 A.3d 862 (2014); *Ulbrich* v. *Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013); *State* v. *Moulton*, 310 Conn. 337, 362–63 and n.23, 78 A.3d 55 (2013); *State* v. *Polanco*, 308 Conn. 242, 260–61, 61 A.3d 1084 (2013); *State* v. *Sanchez*, 308 Conn. 64, 80, 60 A.3d 271 (2013); *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012); *State* v. *Paige*, 304 Conn. 426, 446, 40 A.3d 279 (2012); *Gross* v. *Rell*, 304 Conn. 234, 270–71, 40 A.3d 240 (2012); *Arrowood Indemnity Co.* v. *King*, 304 Conn. 179, 201, 39 A.3d 712 (2012); *State* v. *Payne*, 303 Conn. 538, 541–42, 34 A.3d 370 (2012); *State* v. *Kitchens*, 299 Conn. 447, 472–73, 10 A.3d 942 (2011); *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 778–79 n.26, 6 A.3d 726 (2010); *State* v. *Connor*, 292 Conn. 483, 528 n.29, 973 A.2d 627 (2009); *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 729 n.37, 966 A.2d 188 (2009); *State* v. *DeJesus*, supra, 288 Conn. 437; *State* v. *Salamon*, supra, 287 Conn. 514; *Jaiguay* v. *Vasquez*, 287 Conn. 323, 348, 948 A.2d 955 (2008); *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *Gibbons* v. *Historic District Commission*, 285 Conn. 755, 771, 941 A.2d 917 (2008). In all twenty-five cases, the subsequent overruling panel was different from the panel that decided the cases being overruled. Moreover, Chief Justice Rogers either authored or joined the majority in nineteen of these cases. See *State* v. *Wright*, supra, 830; *Campos* v. *Coleman*, supra, 64; *State* v. *Moreno-Hernandez*, supra, 292, 312; *Haynes* v. *Middletown*, supra, 305; *State* v. *Artis*, supra, 131, 161; *State* v. *Elson*, supra, 726, 785; *Ulbrich* v. *Groth*, supra, 470; *State* v. *Moulton*, supra, 337, 370; *State* v. *Polanco*, supra, 242, 263; *State* v. *Sanchez*, supra, 64, 87; *State* v. *Guilbert*, supra, 274; *Gross* v. *Rell*, supra, 237; *Arrowood Indemnity Co.* v. *King*, supra, 179, 204; *State* v. *Payne*, supra, 541; *State* v. *Kitchens*, supra, 500; *State* v. *Connor*, supra, 483, 533; *State* v. *DeJesus*, supra, 420; *State* v. *Grant*, supra, 502 ; *Gibbons* v. *Historic District Commission*, supra, 755, 778. Chief Justice Rogers dismisses my point by stating that there is no inconsistency in her position in the foregoing cases and the position she takes in the

present appeal. See footnote 1 of Chief Justice Rogers' concurring opinion. *Anyone who reads the cases Justice Espinosa and I cite, however, will discover that not once, in any of these twenty-five cases, has this court, or Chief Justice Rogers, ever raised a concern over a change in panel membership or queried how a departed justice who was in the majority would have ruled if he or she had still been a member of the court.* In fact, in seventeen cases—*Wright, Arras, Moreno-Hernandez, Haynes, Ulbrich, Sanchez, Paige, Gross, King, Payne, Kitchens, Bysiewicz, Connor, St. Joseph's Living Center, Inc., DeJesus, Grant,* and *Gibbons*—the words "stare decisis" cannot be found in the majority opinions at all.

[31] At oral arguments in the present appeal, counsel was asked whether our ruling in *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 141, 147–48, 957 A.2d 407 (2008), also a controversial four to three decision, which held that a statute purporting to prohibit same sex marriage was unconstitutional, could be attacked and overruled. I again note that a decision should not receive special stare decisis consideration because it was decided by one vote rather than two or three. In addition, and more important, I doubt that this court, notwithstanding the United States Supreme Court's recent decision in *Obergefell* v. *Hodges*,      U.S.     , 135 S. Ct. 2584, 2604–2605, 192 L. Ed. 2d 609 (2015), could overrule *Kerrigan* in light of the tremendous reliance interests that decision has engendered. First, the day after we decided *Kerrigan*, marriage licenses were being issued to same-sex couples. Second, there has been a reordering in employee benefits and health insurance in light of *Kerrigan*. Third, it is likely that the principles represented by *Kerrigan* have become part of the consciousness of the citizens of this state. Undoubtedly, there has been even more reliance on *Kerrigan* than that which I just outlined.

In his concurring opinion, Justice Robinson suggests that the reliance in the present case is different only in kind and not in degree from the reliance interests that would be at stake if *Kerrigan* were reconsidered. See footnote 6 of Justice Robinson's concurring opinion. In light of my analysis in part I B of this opinion, I cannot fathom the logic behind such a claim.

---